IN THE SUPREME COURT OF NORTH CAROLINA

No. 331PA21

Filed 28 April 2023

COMMUNITY SUCCESS INITIATIVE; JUSTICE SERVED NC, INC; WASH AWAY UNEMPLOYMENT; NORTH CAROLINA STATE CONFERENCE OF THE NAACP; TIMOTHY LOCKLEAR; DRAKARUS JONES; SUSAN MARION; HENRY HARRISON; ASHLEY CAHOON; and SHAKITA NORMAN

v.

TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as Chairman of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; KENNETH RAYMOND, in his official capacity as Member of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Member of the North Carolina State Board of Elections; and DAVID C. BLACK, in his official capacity as Member of the North Carolina State Board of Elections

Appeal pursuant to N.C.G.S. § 7A-27(b) from a final judgment and order entered on 28 March 2022 by a three-judge panel in Superior Court, Wake County, following transfer of the matter to the panel pursuant to N.C.G.S. § 1-267.1. On 4 May 2022, pursuant to N.C.G.S. § 7A-31(a) and (b)(2), the Supreme Court allowed plaintiffs' petition for discretionary review prior to determination by the Court of Appeals. Heard in the Supreme Court on 2 February 2023.

*Forward Justice, by Daryl Atkinson, Whitley Carpenter, Kathleen F. Roblez, Ashley Mitchell, and Caitlin Swain; Arnold & Porter Kaye Scholer LLP, by R. Stanton Jones and Elisabeth S. Theodore; and Protect Democracy Project, by Farbod K. Faraji, for plaintiff-appellees.*

*Cooper & Kirk, PLLC, by Nicole J. Moss, David Thompson, Peter A. Patterson, Joseph O. Masterman, and William V. Bergstrom; and K&L Gates, by Nathan A. Huff, for defendant-appellants Legislative Defendants.*

*Tin, Fulton, Walker & Owen, PLLC, by Abraham Rubert-Schewel, for Cato Institute and Due Process Institute, amici curiae.*

*Poyner Spruill LLP, by Caroline P. Mackie; and Karl A. Racine, Attorney General for the District of Columbia, by Caroline S. Van Zile, Solicitor General, for the District of Columbia and the States of California, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, Rhode Island, and Washington, amici states.*

*Law Offices of F. Bryan Brice, Jr., by Anne M. Harvey; and Proskauer Rose LLP, by Lloyd B. Chinn and Joseph C. O'Keefe, for Institute for Innovation in Prosecution at John Jay College, amicus curiae.*

*North Carolina Justice Center, by Sarah Laws, Laura Holland, and Quisha Mallette, for the North Carolina Justice Center and Down Home NC, amici curiae.*

*Patterson Harkavy LLP, by Paul E. Smith and Burton Craige, for the Sentencing Project, the Lawyers' Committee for Civil Rights Under Law, and the Southern Poverty Law Center, amici curiae.*

ALLEN, Justice.

Our state constitution ties voting rights to the obligation that all citizens have to refrain from criminal misconduct. Specifically, it denies individuals with felony convictions the right to vote unless their citizenship rights are restored "in the manner prescribed by law." N.C. Const. art. VI, § 2(3). No party to this litigation disputes the validity of Article VI, Section 2(3) of the North Carolina Constitution. This case is therefore not about whether disenfranchisement should be a consequence of a felony conviction. The state constitution says that it must be, and we are bound

by that mandate.

This case involves instead challenges to N.C.G.S. § 13-1, the statute that sets out the criteria that felons must satisfy to be eligible for re-enfranchisement. In the early 1970s, the General Assembly embarked on a series of reforms to section 13-1 and related statutory provisions. The first round of reforms eliminated complicated petition-and-hearing procedure that had long hindered attempts by eligible felons to regain their rights. The second round left us with essentially the version of section 13-1 in effect today, under which felons automatically regain the right to vote once they complete their sentences, including any periods of probation, parole, or post-release supervision to which they are subject.[1]

Nearly fifty years after the legislature rewrote section 13-1 to make re-enfranchisement automatic for all eligible felons, plaintiffs filed suit alleging equal protection and other state constitutional challenges to the requirement that felons complete their probation, parole, or post-release supervision before they regain their voting rights. In particular, plaintiffs alleged that the legislators who imposed this

---

[1] "Probation" refers to a term of court-ordered supervision that eligible offenders may serve in the community instead of in confinement. *See generally* N.C.G.S. ch. 15A, art. 82 (2021) (Probation). The term "parole" refers to the early release, subject to conditions, of persons serving sentences of imprisonment for convictions of impaired driving under N.C.G.S. § 20-138.1. N.C.G.S. § 15A-1370.1 (2021); *see generally* N.C.G.S. ch. 15A, art. 85 (Parole). Certain inmates whose crimes occurred before the Structured Sentencing Act took effect on 1 October 1994 are also eligible for parole. "Post-release supervision" refers to a "period of supervised release, similar to probation, that an inmate serves in the community upon release from prison." James M. Markham, *The North Carolina Justice Reinvestment Act* 5 (UNC School of Government 2012); *see generally* N.C.G.S. ch. 15A, art. 84A (2021) (Post-Release Supervision).

requirement intended to discriminate against African Americans. To prove this claim, plaintiffs introduced statistical evidence to show that African Americans constitute a disproportionate share of felons on probation, parole, or post-release supervision. Plaintiffs also argued that the requirement perpetuates the racist intent behind nineteenth century laws enacted to disenfranchise or suppress the votes of African Americans.

The trial court ruled in plaintiffs' favor and entered an order allowing all felons not in jail or prison to register and vote. In so doing, the trial court misapplied the law and overlooked facts crucial to its ruling. The statistical evidence relied on by the court does not establish that requiring felons to finish their sentences prior to re-enfranchisement disproportionately affects African American felons. Moreover, the trial court wrongly imputed the discriminatory views of nineteenth century lawmakers to the legislators who made it easier for eligible felons of all races to regain their voting rights. The changes to section 13-1 appear to have been undertaken in good faith.

The evidence does not prove that legislators intended their reforms to section 13-1 in the early 1970s to disadvantage African Americans, nor does it substantiate plaintiffs' other constitutional claims. It is not unconstitutional to insist that felons pay their debt to society as a condition of participating in the electoral process. We therefore reverse the trial court's final order and judgment.

## I.    Background

Laws prohibiting persons convicted of felonies from voting have long been common features of the American legal system. When the Fourteenth Amendment to the United States Constitution was ratified in 1868, twenty-nine of the nation's then thirty-seven states had provisions in their state constitutions that either denied felons the right to vote or allowed their respective legislatures to enact legislation to that effect. *Richardson v. Ramirez*, 418 U.S. 24, 48 (1974). "Today, almost all States disenfranchise felons in some way, although the recent trend is toward expanding access to the franchise." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1029 (11th Cir. 2020) (en banc).

North Carolina's 1776 constitution did not prohibit felons from voting. Rather, "the 1776 constitution . . . granted the franchise indiscriminately to all 'freemen' who met the property qualification, including free blacks." John V. Orth and Paul Martin Newby, *The North Carolina State Constitution* 14 (2d ed. 2013) [hereafter *State Constitution*].

In 1835 the citizens of North Carolina ratified a group of extensive amendments to the 1776 constitution regulating elections and office-holding. John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1771 (1992) [hereafter *Constitutional History*]. One noted the loss of citizenship rights by "any person convicted of an infamous crime" but authorized the General Assembly to "pass general laws regulating" the restoration of such rights. N.C. Const. of 1776, amends. of 1835, art. I, § 4, cls. 3–4. Another amendment deprived free African Americans of

the right to vote. N.C. Const. of 1776, amends. of 1835, art. I, § 3, cl. 3.

In 1841 the General Assembly enacted legislation providing for the restoration of citizenship rights for persons convicted of infamous crimes. An Act Providing for Restoring to the Rights of Citizenship Persons Convicted of Infamous Crimes, ch. 36, §§ 1–6, 1841 N.C. Sess. Laws 68, 68–69. The legislation instituted a lengthy and burdensome petition-and-hearing procedure for rights restoration. A petitioner had to wait a minimum of four years after his conviction to file his petition. *Id.* § 3. Notwithstanding where the petitioner resided, he had to file the petition in the superior court of the county where he had been indicted. *Id.* § 4. The petition had to set out the petitioner's "conviction and the punishment inflicted," as well as his current residence, his occupation since conviction, and the "meritorious causes" justifying the restoration of his rights. *Id.* § 1. The clerk of court then had to advertise the substance of the petition at the courthouse door for three months prior to the petitioner's proposed hearing date. *Id.* At the hearing, the petition's contents had to be "proved" by "five respectable witnesses" who had known the petitioner for the three years immediately preceding the petition's filing date and who could confirm "his character for truth and honesty." *Id.* If the five witnesses supplied the necessary character evidence and the court was "satisfied of the truth of the facts set forth in the petition," the court was to "decree [the petitioner's] restoration to the lost rights of citizenship." *Id.*

Following the Civil War, North Carolinians ratified a new state constitution

drafted by a convention held in compliance with federal Reconstruction legislation. *State Constitution* at 19. The 1868 constitution removed all property qualifications for voting and extended voting rights to all male citizens, regardless of race, who had reached the age of twenty-one and satisfied certain residency requirements. N.C. Const. of 1868, art. I, § 22 (eliminating property qualifications for voting); *id.* art. VI, § 1 (designating as an "elector" every male aged twenty-one or older who fulfilled specified residency requirements). Although the 1868 constitution did not expressly prohibit felons from voting, it repeated the "infamous crimes" language that had been added to the 1776 constitution in 1835. *Id.* art. II, § 13.

In 1875 the General Assembly called a convention to propose amendments to the 1868 constitution. An Act to Call a Convention of the People of North Carolina, ch. 222, 1874–75 N.C. Sess. Laws 303, 303–05. Ratified by voters in 1876, the thirty amendments approved by the convention contained several racially discriminatory measures. One amendment banned interracial marriage between whites and African Americans, N.C. Const. of 1868, amend. XXX of 1875, while another mandated racially segregated schools, *id.* amend. XXVI. Other amendments that did not mention race had the deliberate effect of reducing the political influence of African Americans. One such amendment restored the General Assembly's power to appoint local government officials. *See id.* amend. XXV. "[A]s was well understood," the purpose of that amendment "was to block control of local government in the eastern counties by blacks who were in the majority there." *State Constitution* at 26.

The 1875 amendments contained the state's first constitutional provision expressly denying the franchise to individuals convicted of felonies. Under that provision, "no person . . . adjudged guilty of [a] felony, or of any other crime infamous by the laws of this State" could vote without first having been "restored to the rights of citizenship in a mode prescribed by law." N.C. Const. of 1868, amend. XXIV of 1875. In 1877 the General Assembly criminalized voting by felons whose rights had not been restored.[2] An Act to Regulate Elections, ch. 275, §§ 10, 62, 1877 N.C. Sess. Laws 516, 519–20, 537. The 1877 law did not articulate the steps that felons had to follow to have their citizenship rights restored, so the procedures set out in the 1841 rights restoration legislation remained in place, including the four-year waiting period and the petition-and-hearing requirements.

Between 1897 and 1941, the General Assembly enacted legislation that relaxed some of the rules for petitions filed by felons seeking restoration of their citizenship rights. *See*, *e.g.*, An Act to Amend Section 2940 of the Code in Reference to Restoration of Citizenship, ch. 110, § 1, 1897 N.C. Sess. Laws 155, 155–56 (allowing a petitioner to file in the county of indictment or county of residence). Some of the enactments reduced the waiting period for felons in designated categories. *See*, *e.g.*, An Act to Amend Section Two Thousand Nine Hundred and Forty-One of the Code, and to Facilitate the Restoration to the Rights of Citizenship in Certain Cases, ch. 44, § 1,

---

[2] It remains a crime for any felon whose rights have not been restored to vote in a primary or general election. N.C.G.S. § 163-275(5) (2021).

-8-

1899 N.C. Sess. Laws 139, 139 (shortening to one year the waiting period after conviction when the petitioner (1) had not been sentenced to a term of imprisonment and (2) had been pardoned by the Governor); An Act to Amend Chapter 44, Acts of 1899, and to Facilitate the Restoration to the Rights of Citizenship in Certain Cases, ch. 547, § 2, 1905 N.C. Sess. Laws 553, 554 (allowing a petitioner to file at any time after conviction and without alleging or proving a pardon if the court suspended judgment); An Act to Provide for the Return of Rights of Citizenship to Offenders Committed to Certain Training Schools, ch. 384, § 1, 1937 N.C. Sess. Laws 713, 713 (reducing to one year after discharge the waiting period for felons committed to certain "training schools"). In 1933, the legislature replaced the requirement that felons wait four years after conviction to file their petitions with a requirement that they wait two years after being discharged. An Act to Amend Consolidated Statutes with Reference to Restoration to Citizenship, ch. 243, § 1, 1933 N.C. Sess. Laws 370, 370.

By 1969 the General Assembly had codified the rules for the restoration of felons' citizenship rights as Chapter 13 of our General Statutes. N.C.G.S. § 13-1 (1969) (repealed 1971). On 2 July 1969, the General Assembly passed legislation to submit what became our current state constitution to the electorate for approval. An Act to Revise and Amend the Constitution of North Carolina, ch. 1258, 1969 N.C. Sess. Laws 1461. Voters ratified the new constitution in the 1970 general election, and it went into effect on 1 July 1971.

The 1971 constitution continues our state's general prohibition against voting by felons:

> No person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

N.C. Const. art. VI, § 2(3). The text of Article VI, Section 2(3) tracks that of the corresponding 1876 amendment, though there are differences. Article VI, Section 2(3) does not refer to infamous crimes. It encompasses not just individuals convicted of felonies under our state's laws but also persons convicted of felonies under federal law or, if the conduct would have been felonious here, convicted of felonies in other states. *Id.*

During the 1971 legislative session, Representatives Joy Johnson of Robeson County and Henry Frye of Guilford County[3]—then the only African American members of the General Assembly—introduced a bill to amend Chapter 13 of the General Statutes.[4] In its original form, the bill provided for the automatic restoration of citizenship rights for any felon "upon the full completion of his sentence or upon [his] receiving an unconditional pardon." A legislative committee amended the bill to

---

[3] Representative Henry Frye subsequently served as an Associate Justice and then as Chief Justice of this Court.

[4] The trial court's final judgment and order states that Representatives Johnson and Frye both introduced the bill to amend Chapter 13. However, the copy of the bill in the record names only Representative Johnson as a sponsor.

remove the word "automatically" and to clarify that the phrase "full completion of his sentence" included "any period of probation or parole." The final form of the bill passed into law by the legislature in 1971 repealed Chapter 13 "in its entirety" and enacted "a new Chapter 13." An Act to Amend Chapter 13 of the General Statutes to Require the Automatic Restoration of Citizenship to Any Person Who Has Forfeited Such Citizenship Due to Committing a Crime and has Either Been Pardoned or Completed His Sentence, ch. 902, § 1, 1971 N.C. Sess. Laws 1421, 1421.

The new Chapter 13 did not make rights restoration automatic, but it did dramatically streamline the process, largely by eliminating the petition-and-hearing requirements. Under N.C.G.S. § 13-1, anyone convicted of a felony became eligible for rights restoration if (1) the Department of Correction recommended restoration at the time of release, (2) the individual received an unconditional pardon, *or* (3) "two years ha[d] elapsed since [the person's] release by the Department of Correction, including probation or parole." *Id.* Once any of the three conditions was met, the eligible felon could regain his citizenship rights by going "before any judge of the General Court of Justice in Wake County or in the county where [the felon] reside[d] or in which [the felon] was last convicted" and taking an oath verifying compliance with section 13-1 and pledging loyalty and obedience to "the Constitution and laws of the United States, and the Constitution and laws of North Carolina not inconsistent therewith." *Id.*

In 1973 Representatives Johnson and Frye, joined by a new African American legislator, Representative (later Senator) Henry Michaux Jr., tried again to make the

-11-

restoration of citizenship rights automatic for some felons. Their bill as introduced amended section 13-1 to make rights restoration automatic "[u]pon the unconditional discharge of an inmate by the Department of Correction or Department of Juvenile Correction, of a probationer by the Probation Commission, or of a parolee by the Board of Paroles[,] . . . [o]r upon [a felon's] receiving an unconditional pardon." The version of the bill ultimately passed by the General Assembly did not differ materially from the initial bill. *See* An Act to Provide for the Automatic Restoration of Citizenship, ch. 251, § 1, 1973 N.C. Sess. Laws 237, 237–38.

The few changes that the legislature has made to section 13-1 since 1973 have no bearing on the issues raised in this litigation. In its current form, section 13-1 reads as follows:

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
>
> (1) The unconditional discharge of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the court.
>
> (2) The unconditional pardon of the offender.
>
> (3) The satisfaction by the offender of all conditions of a conditional pardon.
>
> (4) With regard to any person convicted of a crime against the United States, the unconditional discharge of such person by the agency of the United States having jurisdiction of such person,

> the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.
>
> (5) With regard to any person convicted of a crime in another state, the unconditional discharge of such person by the agency of that state having jurisdiction of such person, the unconditional pardon of such person or the satisfaction by such person of a conditional pardon.

N.C.G.S. § 13-1 (2021). The parties to this litigation agree that subsection (1) of section 13-1 renders persons convicted of felonies in our state courts ineligible for rights restoration until they have finished any applicable period of probation, parole, or post-release supervision (collectively, felony supervision).

Plaintiffs consist of four nonprofit organizations (plaintiff-organizations) that work with or advocate for persons involved with the criminal justice system and six individuals with felony convictions (plaintiff-felons) who are unable to vote while on felony supervision. On 20 November 2019, plaintiffs filed suit against defendants in their official capacities challenging section 13-1 as facially unconstitutional under various provisions of our state constitution.[5] Specifically, plaintiffs alleged that section 13-1 is unconstitutional in that it violates (1) the Equal Protection Clause in Article I, Section 19 by discriminating against African Americans in intent and effect;

---

[5] Defendants Timothy K. Moore, Speaker of the North Carolina House of Representatives, and Philip E. Berger, President Pro Tempore of the North Carolina Senate, are pursuing this appeal. Plaintiffs' lawsuit also named as defendants the North Carolina State Board of Elections and members of the same, but none of those defendants appealed the trial court's order.

(2) the Equal Protection Clause in Article I, Section 19 and the Property Qualifications Clause in Article I, Section 11 by conditioning the restoration of citizenship rights on the ability to pay court costs, fines, or restitution; (3) the Equal Protection Clause in Article I, Section 19 by depriving convicted felons of the "fundamental right" to vote on "equal terms" and with "substantially equal voting power"; and (4) the Free Elections Clause in Article I, Section 10 by producing elections that do not reflect the will of the people.[6]

Pursuant to N.C.G.S. § 1-267.1, the Chief Justice assigned the case to a three-judge panel in the Superior Court, Wake County. With one judge dissenting in part, the trial court granted partial summary judgment and a preliminary injunction in favor of plaintiffs, finding that section 13-1 "condition[s] the restoration of the right to vote on the ability to make financial payments" in violation of the Equal Protection Clause and the Property Qualifications Clause. On 28 March 2022, following a trial on the remaining claims, the court in another two-to-one decision issued a final judgment and order ruling that section 13-1 discriminates against African Americans and deprives felons of the fundamental right to vote in violation of the Equal Protection Clause and results in elections that do not reflect the will of the people contrary to the Free Elections Clause. The trial court issued a permanent injunction

---

[6] Plaintiffs likewise challenged section 13-1 under Article I, Sections 12 (right of assembly and petition) and 14 (freedom of speech and press). The trial court granted summary judgment in favor of defendants on those claims, and plaintiffs did not appeal that ruling.

under which any person otherwise eligible to vote and "not in jail or prison for a felony conviction . . . may lawfully register and vote in North Carolina." Defendants timely appealed.

On 26 April 2022, a split panel of the Court of Appeals issued a partial writ of supersedeas, staying the trial court's injunction for the "elections on 17 May 2022 and 26 July 2022." The panel also ordered the State Board of Elections "to take actions to implement" the trial court's order "for subsequent elections." On 4 April 2022, and in accordance with N.C.G.S. § 7A-31, plaintiffs filed in this Court a petition for discretionary review prior to a determination by the Court of Appeals. This Court allowed the petition on 4 May 2022.

## II.  Jurisdiction

Defendants argue that plaintiffs lack standing to dispute the constitutionality of section 13-1. "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy such that he or she may properly seek adjudication of the matter." *Am. Woodland Indus. v. Tolson*, 155 N.C. App. 624, 626, 574 S.E.2d 55, 57 (2002). "A plaintiff must establish standing in order to assert a claim for relief." *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 625, 881 S.E.2d 32, 44 (2022). We must therefore address defendants' standing arguments before we may reach the substance of the trial court's rulings.

Defendants contend that plaintiffs lack standing because (1) plaintiffs have "challenged the wrong law" and (2) plaintiffs' claims are not judicially redressable. In

support of their first argument, defendants point out that plaintiffs have been disenfranchised by Article VI, Section 2(3) of the North Carolina Constitution, not by section 13-1, which merely sets out the "manner prescribed by law" for felon *re-enfranchisement*. With respect to their redressability argument, defendants maintain that, since only the legislature has the power to define the rights restoration process for persons disenfranchised under Article VI, Section 2(3), a final judgment striking down section 13-1 would not open the door to voting by individuals on felony supervision; rather, it would "close[ ] off the sole avenue by which a felon may regain the franchise while leaving in place the constitutional provision that strips it away in the first place." Hence, as defendants see things, the real impact of a final judgment in plaintiffs' favor would be to deny to all felons whose rights have not yet been restored any path to regaining the franchise.

Plaintiffs insist that they do have standing to challenge the constitutionality of section 13-1 because that statute "prevents people from registering and voting as long as they are on felony probation, parole, or post-release supervision." Plaintiffs argue that any rights restoration legislation enacted by the General Assembly pursuant to Article VI, Section 2(3) "must comport with all other provisions of the North Carolina Constitution." They further contend that the remedy ordered by the trial court falls within the judiciary's broad discretion to fashion equitable remedies for constitutional violations. Plaintiffs cite decisions in which the Supreme Court of the United States has ordered federal agencies to extend benefits to classes of persons

that federal law unconstitutionally excluded. *See, e.g.*, *Califano v. Westcott*, 443 U.S. 76, 92–93 (1979) (affirming a lower court's order that a federal benefits program offer the same financial support to dependent children of unemployed mothers that the law provided for dependent children of unemployed fathers).

The standing requirements articulated by this Court are not themselves mandated by the text of the North Carolina Constitution. *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 599, 853 S.E.2d 698, 728 (2021) ("[T]he 'judicial power' provision [in Article IV] of our Constitution imposes no particular requirement regarding 'standing' at all."). This Court has developed standing requirements out of a "prudential self-restraint" that respects the separation of powers by narrowing the circumstances in which the judiciary will second guess the actions of the legislative and executive branches. *Id.*

When a plaintiff challenges the constitutionality of a statute, "[t]he 'gist of the question of standing' is whether" the plaintiff "has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Stanley v. Dep't of Conservation and Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)). To ensure the requisite concrete adverseness, "a party must show they suffered a 'direct injury.' The personal or 'direct injury' required in this context could be, but is not necessarily limited to, 'deprivation of a constitutionally guaranteed

personal right or an invasion of his property rights.'" *Forest*, 376 N.C. at 607–08, 853 S.E.2d at 733 (citations omitted).

"[T]he rule requiring direct injury to challenge the constitutionality of a statute is based on the rationale 'that only one with a genuine grievance, one personally injured by a statute, can be trusted to battle the issue.'" *Id.* at 594, 853 S.E.2d at 724. (quoting *Stanley*, 284 N.C. at 28, 199 S.E.2d at 650). The direct injury criterion applies even where, as here, a plaintiff assails the constitutionality of a statute through a declaratory judgment action. *See United Daughters*, 383 N.C. at 629, 881 S.E.2d at 46–47 ("[P]laintiff is still required to demonstrate that it has sustained a legal or factual injury arising from defendants' actions as a prerequisite for maintaining the present declaratory judgment action.").

Defendants make plausible arguments in urging us to throw out plaintiffs' lawsuit on standing grounds. The amended complaint repeatedly mischaracterizes section 13-1 as "North Carolina's felony disenfranchisement statute." Section 13-1 does not disenfranchise anyone. Like other felons, plaintiff-felons had their right to vote eliminated by Article VI, Section 2(3). Had the General Assembly not enacted section 13-1 or some other statute providing for the restoration of their citizenship rights, plaintiff-felons and all other felons in this state would be disenfranchised permanently. *See Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (holding that the federal constitution's Equal Protection Clause did not bar California from denying the vote to felons who had completed their sentences and periods of parole).

Moreover, the trial court may well have exceeded the bounds of its remedial powers by ordering that all felons not in jail or prison be allowed to register and vote. In depriving felons of the right to vote unless their citizenship rights have been restored "in the manner prescribed by law," Article VI, Section 2(3) unquestionably assumes that the General Assembly—not the courts—will set the conditions for rights restoration, and as discussed above, the legislature has declined to extend automatic rights restoration to persons on felony supervision.

Despite the force of defendants' standing arguments, we hold that plaintiff-felons have standing to bring their claims against defendants. While it is true that section 13-1 confers a statutory benefit that the General Assembly was under no legal obligation to grant, it is also true that the legislature may not condition eligibility for a statutory benefit on criteria that violate the North Carolina Constitution. *See, e.g., Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) ("Even a statutory benefit can run afoul of the Equal Protection Clause . . . if it confers rights in a discriminatory manner . . . . For instance, a state could not choose to re-enfranchise voters of only one particular race . . . .").

The amended complaint alleges that the General Assembly has imposed unconstitutional conditions on the restoration of felons' voting rights. For example, the law makes payment of any court-ordered costs, fines, and restitution a condition of probation. N.C.G.S. § 15A-1343(b)(9) (2021). If a felon is found to have violated this condition, his time on probation—and thus his ineligibility to vote—can be extended.

N.C.G.S. §§ 15A-1342(a) (2021), 15A-1344(a), (d) (2021). The amended complaint asserts that, by tying a felon's eligibility to vote to the completion of probation, section 13-1 "condition[s] the right to vote on whether people have a type of property—money." According to the amended complaint, this condition violates Article I, Section 11 of the state constitution, which provides that "no property qualification shall affect the right to vote or hold office." N.C. Const. art. I, § 11. We ultimately reject this claim, but it does not follow that plaintiff-felons lacked standing to bring it or their other constitutional claims. The amended complaint alleges that plaintiff-felons are on felony supervision and subject to the allegedly unconstitutional re-enfranchisement conditions of which they complain. Plaintiff-felons thus have been "personally injured by [the] statute" and "can be trusted to battle the issue." *Stanley*, 284 N.C. at 28, 199 S.E.2d at 650.

Furthermore, the constitutional violations alleged in the amended complaint are redressable. The question of redressability turns not on whether a plaintiff can obtain her preferred form of relief but on whether the law provides a remedy for the plaintiff's injury. *See Lozano v. City of Hazleton*, 620 F.3d 170, 192 (3d Cir. 2010) ("Redressability . . . does not require that a court be able to solve all of a plaintiff's woes. Rather, [it] need only be able to redress, to some extent, the specific injury underlying the suit."), *vacated and remanded for further consideration*, 563 U.S. 1030 (2011), *aff'd in part and rev'd in part on other grounds,* 724 F.3d 297 (3d Cir. 2013). The essence of the amended complaint's claims is that section 13-1 attaches

conditions to the restoration of citizenship rights that unlawfully distinguish between felons based on race or wealth. A court order that simply struck down section 13-1 would leave plaintiff-felons and all other felons whose rights had not already been restored in precisely the same position regardless of race or wealth: disenfranchised without any avenue for re-enfranchisement. This outcome would not give plaintiff-felons what they want, but it would halt the alleged violations of the North Carolina State Constitution.

Although plaintiff-felons have standing, some plaintiff-organizations clearly do not. For a legal entity other than a natural person to have standing, it or one of its members "must suffer some immediate or threatened injury." *River Birch Assocs. v. City of Raleigh*, 326 N.C. 100, 129, 388 S.E.2d 538, 555 (1990). "An association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Standing exists for an association to bring a lawsuit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 130, 388 S.E.2d at 555 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The amended complaint alleges that plaintiff-organizations Community

Success Initiative, Justice Served N.C., Inc., and Wash Away Unemployment have standing because they work to reintegrate into society "people who find themselves entangled in the criminal justice system" and that section 13-1 forces them to redirect some of their resources "to educate people, including people disenfranchised under [section] 13-1, about their voting rights (or lack thereof)." Such vague allegations of resource reallocation do not evince the kind of direct injury necessary for an association acting in its own right to attack the constitutionality of a statute, nor do they offer grounds to believe that section 13-1 infringes on any rights or immunities that these three plaintiff-organizations may possess. Additionally, inasmuch as the amended complaint does not allege that Community Success Initiative, Justice Served N.C., Inc., and Wash Away Unemployment have any members who could challenge section 13-1, they lack standing to sue on behalf of their members. *See id.*

Similarly, the amended complaint's allegations concerning plaintiff-organization North Carolina State Conference of the NAACP do not establish that it has standing in its own right to dispute the validity of section 13-1. In language that echoes the descriptions of "harm" allegedly suffered by other plaintiff-organizations, the amended complaint alleges that the North Carolina NAACP "is currently forced to divert organizational resources away from activities core to its mission in furtherance of education and voter engagement efforts required to assist potential voters . . . in understanding North Carolina's felony-based disenfranchisement laws." Again, this vague allegation of resource reallocation does not identify a direct injury

for standing purposes.

The amended complaint's factual allegations are sufficient, however, to show that the North Carolina NAACP qualifies under *River Birch* to sue on behalf of its members. The amended complaint alleges that some of those members are ineligible for re-enfranchisement under section 13-1. It ties the interest of those members in regaining the franchise to the North Carolina NAACP's "fundamental mission of . . . advanc[ing] and improv[ing] . . . the political, civil, educational, social, and economic status of minority groups." Finally, because plaintiffs brought a declaratory judgment action, it appears that the North Carolina NAACP can obtain relief for its members without their participation in the lawsuit. *See id.* ("When an organization seeks declaratory or injunctive relief on behalf of its members, 'it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.' " (quoting *Warth*, 422 U.S. at 515)).

Plaintiff-felons and one plaintiff-organization have standing to pursue the claims alleged in the amended complaint. Accordingly, we now take up defendants' legal challenges to the merits of the trial court's ruling.

## III. Standard of Review

Whether made at summary judgment or at trial, a trial court's ruling on the constitutionality of a statute receives de novo review on appeal. *State v. Whittington*, 367 N.C. 186, 190, 753 S.E.2d 320, 323 (2014); *Hart v. State*, 368 N.C. 122, 130–31, 774 S.E.2d 281, 287 (2015). Under de novo review, this Court " 'considers the matter

anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Appeal of Greens of Pine Glen Ltd.*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)). When the trial court has conducted a trial without a jury, we examine whether the trial court's findings of fact support its conclusions of law. *Blanton v. Blanton*, 40 N.C. App. 221, 225, 252 S.E.2d 530, 533 (1979). "[T]he trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. 126, 139, 804 S.E.2d 449, 457 (2017) (quoting *Bailey v. State*, 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998)).

We review permanent injunctions for abuse of discretion. *See Roberts v. Madison Cnty. Realtors Ass'n*, 344 N.C. 394, 399, 474 S.E.2d 783, 787 (1996) ("When equitable relief is sought, courts claim the power to grant, deny, limit, or shape that relief as a matter of discretion."). "A [trial] court by definition abuses its discretion when it makes an error of law." *State v. Rhodes*, 366 N.C. 532, 536, 743 S.E.2d 37, 39 (2013) (alteration in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

## IV.   Analysis

Given the number and complexity of the legal issues raised by the parties to this appeal, we briefly review the fundamental principles that guide our inquiry when an appeal squarely presents a state constitutional challenge to the validity of a statute. One such principle is that we defer to legislation enacted by the General

Assembly. *See State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989) ("Since our earliest cases applying the power of judicial review under the Constitution of North Carolina, . . . we have indicated that great deference will be paid to acts of the legislature . . . .").

We defer to legislative enactments for at least two reasons. The first is the status of legislative enactments in our constitutional order. In this state, "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I, § 2. Ordinarily, the people exercise this sovereign power through their elected representatives in the General Assembly. *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895). This Court therefore looks upon laws enacted by our General Assembly as expressions of the people's will. *Preston*, 325 N.C. at 448, 385 S.E.2d at 478. It follows that we may not strike down a law unless it violates federal law or the supreme expression of the people's will, the North Carolina Constitution. *See id.* at 448–49, 385 S.E.2d at 478; *see also State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944) ("The will of the people as expressed in the Constitution is the supreme law of the land.").

The second reason for deference is more practical. Almost by definition, legislation involves the weighing and accommodation of competing interests, and "it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Beaufort Cnty. Bd. of Educ. v.*

*Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009). When a statute constitutes a permissible exercise of legislative authority, we must uphold the statute regardless of whether we agree with the General Assembly's public policy choices. *See In re Appeal of Philip Morris U.S.A.*, 335 N.C. 227, 231, 436 S.E.2d 828, 831 (1993) ("[T]he determination of whether a particular policy is wise or unwise is for determination by the General Assembly."); *Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 41, 175 S.E.2d 665, 671 (1970) ("[Q]uestions as to public policy are for legislative determination."). Put differently, "[t]his Court will only measure the balance struck in the statute against the minimum standards required by the constitution." *Beaufort Cnty. Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at 280–81.

Consistent with the deference owed to legislative enactments, when this Court is called upon to decide the constitutionality of a statute, we start with a strong presumption of the statute's validity. *Am. Equitable Assurance Co. v. Gold*, 249 N.C. 461, 462–63, 106 S.E.2d 875, 876 (1959); *see also Hart*, 368 N.C. at 131, 774 S.E.2d at 287 ("We therefore presume that a statute is constitutional . . . ."). The burden is on the party challenging the statute to demonstrate its unconstitutionality. *Raleigh Mobile Home Sales, Inc. v. Tomlinson*, 276 N.C. 661, 669, 174 S.E.2d 542, 548 (1970). To prevail, the challenger must demonstrate that the law is unconstitutional beyond a reasonable doubt. *See Hart*, 368 N.C. at 126, 774 S.E.2d at 284; *see also Glenn v. Bd. of Educ.*, 210 N.C. 525, 529–30, 187 S.E. 781, 784 (1936) ("If there is any

reasonable doubt [as to a law's constitutionality], it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.").

Notwithstanding our deference to legislative enactments, when a challenger proves the unconstitutionality of a law beyond a reasonable doubt, this Court will not hesitate to pronounce the law unconstitutional and to vindicate whatever constitutional rights have been infringed. *Glenn*, 210 N.C. at 529, 187 S.E. at 784; *see also Roller v. Allen*, 245 N.C. 516, 518, 96 S.E.2d 851, 854 (1957) ("An Act will be declared unconstitutional and its enforcement will be enjoined when it clearly appears either that property or fundamental human rights are denied in violation of constitutional guarantees."); *N.C. Real Est. Licensing Bd. v. Aikens,* 31 N.C. App. 8, 11, 228 S.E.2d 493, 495 (1976) ("[T]he courts of this State have not hesitated to strike down regulatory legislation [that is] repugnant to the State Constitution." (citing *Roller*, 245 N.C. 516, 96 S.E.2d 851; *State v. Ballance*, 229 N.C. 764, 51 S.E.2d 731 (1949); *State v. Harris*, 216 N.C. 746, 6 S.E.2d 854 (1940))).

Plaintiffs have brought a facial challenge to section 13-1. In contrast to an as-applied challenge, which "represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act," *Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016) (quoting *Frye v. City of Kannapolis*, 109 F. Supp. 2d 436, 439 (M.D.N.C. 1999)), a facial challenge "is an attack on a statute itself as opposed to a particular application," *Holdstock v. Duke Univ. Health Sys., Inc.*, 270 N.C. App. 267,

272, 841 S.E.2d 307, 311 (2020) (quoting *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015)). "[A] facial challenge to the constitutionality of an act . . . is the most difficult challenge to mount successfully." *Hart*, 368 N.C. at 131, 774 S.E.2d at 288. To establish the unconstitutionality of a statute beyond a reasonable doubt on a facial challenge, "[a] party must show that there are *no circumstances* under which the statute might be constitutional." *Beaufort Cnty. Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at 280 (emphasis added). "The fact that a statute 'might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.' " *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Of course, this Court cannot properly evaluate a challenge to the constitutionality of a statute without understanding the meaning of the constitutional provision at issue. Our interpretive endeavor begins with the text of the provision. "[W]here the meaning is clear from the words used, we will not search for a meaning elsewhere." *Preston*, 325 N.C. at 449, 385 S.E.2d at 479. If the text does not resolve the matter, we examine the available historical record in an effort to isolate the provision's meaning at the time of its ratification. *See Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980) ("Inquiry must be had into the history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation."). We also seek guidance from any on-point precedents from this Court

interpreting the provision. *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 921 (1932). With these fundamental principles in mind, we now direct our attention to the constitutional issues raised by this appeal.

## A. Racial Discrimination

The trial court concluded that "[s]ection 13-1's denial of the franchise to people on felony supervision" unconstitutionally discriminates against African Americans in "intent and effect" and "denies [them] substantially equal voting power on the basis of race" in violation of our state constitution's Equal Protection Clause. Defendants argue that this Court should reverse the trial court because "[s]ection 13-1's historical background demonstrates definitively that the law as it currently stands was not motivated by racial discrimination." Plaintiffs urge us to affirm the trial court, contending that section 13-1 is the successor to earlier felon voting legislation designed to discriminate against African Americans; that the passage of time did not purge section 13-1 of that racially discriminatory intent; and that the General Assembly's refusal in the 1970s to extend the franchise to individuals on felony supervision "was independently motivated by racism."

"The civil rights guaranteed by the Declaration of Rights in Article I of [the North Carolina] Constitution are individual and personal rights entitled to protection against state action . . . ." *Corum v. Univ. of N.C.*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Article I, Section 19 reads in part: "No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the

State because of race, color, religion, or national origin." N.C. Const. art I, § 19. Because the text of this provision does not tell us how to analyze plaintiffs' claims of racial discrimination, we turn to the provision's historical context and pertinent caselaw for assistance.

Unlike most other provisions in Article I, which "may be traced back through [this state's] 1868 constitution to [its] Revolutionary Constitution of 1776[,]" *State Constitution* at 45, the Equal Protection Clause and the Nondiscrimination Clause in Article I, Section 19 did not become part of our fundamental law until 1971, when the current state constitution went into effect. The drafters of the two clauses based their work on the Equal Protection Clause in the Fourteenth Amendment to the United States Constitution and on federal nondiscrimination laws. *Id.* at 68. Accordingly, "[t]his Court's analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009). "However, in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding upon this Court."[7] *Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974).

---

[7] Of course, this Court must follow Supreme Court precedent when we interpret provisions of the United States Constitution.

Section 13-1 makes no reference to race and thus appears to be race neutral. Yet even an apparently race-neutral statute can violate equal protection if enacted with a racially discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Decisions by the Supreme Court of the United States describe a burden-shifting framework that federal courts must employ when a plaintiff alleges that an apparently race-neutral law was motivated by a racially discriminatory purpose contrary to the Fourteenth Amendment's Equal Protection Clause. Under that framework, "the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Moreover, the court must approach any evidence introduced by the plaintiff with a presumption that the legislature acted in good faith. *See Miller v. Johnson*, 515 U.S. 900, 915 (1995) ("[T]he good faith of a state legislature must be presumed . . . .").

To overcome the presumption of good faith and carry the burden of proof, the plaintiff must almost always do more than show that the statute "produces disproportionate effects along racial lines."[8] *Hunter v. Underwood*, 471 U.S. 222, 227

---

[8] In rare cases, statistical evidence alone can establish discriminatory intent. *McCleskey v. Kemp*, 481 U.S. 279, 293–94 (1987) ("[S]tatistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution . . . ." (quoting *Arlington Heights*, 429 U.S. at 266)). Here, however, plaintiffs do not argue that the statistical evidence presented at trial suffices to prove an equal protection violation.

(1985); *see also Arlington Heights*, 429 U.S. at 264–65 ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact."). In its *Arlington Heights* decision, the Supreme Court identified other, nonexclusive factors that can support federal equal protection challenges to ostensibly race-neutral government actions: (1) the historical background of an action; (2) the legislative or administrative history of an action; and (3) deviations from normal procedures. *Arlington Heights*, 429 U.S. at 267–68.

If the plaintiff proves that racial discrimination motivated the legislature, "the burden shifts to the law's defenders[,]" *Hunter*, 471 U.S. at 228, and "judicial deference [to the legislature] is no longer justified[,]" *Arlington Heights*, 429 U.S. at 266. To avoid defeat on the plaintiff's federal equal protection claim at that point, the defenders must show that the statute would have been enacted even if the legislature had not intended to discriminate on racial lines. *Hunter*, 471 U.S. at 228.

Here, the parties and the trial court assumed that the Supreme Court's burden-shifting framework applies to plaintiffs' racial discrimination claims. We are not bound by their assumption, however. *See Baxley v. Nationwide Mut. Ins. Co.*, 104 N.C. App. 419, 422, 410 S.E.2d 12, 14 (1991) ("Generally, parties may stipulate as to matters which involve individual rights and obligations of the parties but may not stipulate as to what the law is."), *aff'd*, 334 N.C. 1, 430 S.E.2d 895 (1993). When resolving claims that a facially neutral law discriminates against persons of a particular race in violation of our state Equal Protection Clause, we are free to depart

from the federal burden-shifting framework if we deem it incompatible with the principles that guide our review of state constitutional challenges to the validity of statutes. Nonetheless, applying that framework to this case solely for the sake of argument, we hold that the trial court erred in ruling that section 13-1 unlawfully discriminates based on race. The court misapplied the framework to the evidence by ignoring Supreme Court precedent that should have informed its approach. Furthermore, and contrary to the court's findings of fact and conclusions of law, the available evidence does not show that racial discrimination inspired the General Assembly to require that felons complete their felony supervision before they regain the right to vote.

### 1. *Trial Court's Findings of Discriminatory Intent not Binding*

The trial court committed legal error by failing to apply the presumption of legislative good faith to the General Assembly's 1971 enactment of a new section 13-1 and 1973 amendments to the same. That presumption applied notwithstanding the lamentable catalogue of measures adopted by legislators in times past for the purpose of disenfranchising African Americans. *See Abbott*, 138 S. Ct. at 2324 ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination."). Rather than presuming good faith, the trial court assumed that past discrimination infected the 1971 and 1973 felon voting legislation because "[t]he legislature cannot purge through the mere passage of time an impermissibly racially discriminatory intent." As explained below, this is precisely

the kind of error criticized by the Supreme Court of the United States in *Abbott*.

Inasmuch as the trial court did not presume legislative good faith, its findings of fact concerning the discriminatory intent allegedly infecting section 13-1 are not binding on appeal. *See id.* at 2326 ("[W]hen a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) (referring to "an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law"))).

### 2. Arlington Heights *Factors*

Serious defects in its treatment of the *Arlington Heights* factors led the trial court to the erroneous conclusion that section 13-1 embodies an unconstitutional legislative intent to suppress the votes of African Americans. The evidence corresponding to each factor should have led the trial court to render judgment in favor of defendants.

#### a. *Disproportionate Impact*

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Arlington Heights*, 429 U.S. at 266 (internal quotation marks and citation omitted).

According to the trial court, the statistical evidence presented by plaintiffs reveals that "North Carolina's denial of the franchise [to those] on felony . . . supervision disproportionately affects African Americans by wide margins." At the statewide level, "African Americans comprise 21% of North Carolina's voting-age population, but over 42% of those denied the franchise due to felony . . . supervision from a North Carolina state court conviction alone. . . . In comparison, White people comprise 72% of the voting-age population, but only 52% of those denied the franchise." Moreover, "[i]n total, 1.24% of the entire African American voting-age population in North Carolina are denied the franchise due to felony . . . supervision, whereas only 0.45% of the White voting-age population are denied the franchise." The result is that African Americans are "denied the franchise at a rate 2.76 times as high as the rate of the White population."

The trial court likewise found that "[e]xtreme racial disparities in denial of the franchise to persons on [felony] supervision also exist at the county level." For instance, "[i]n 77 counties, the rate of African Americans denied the franchise due to felony . . . supervision is high (more than 0.83% of the African American voting-age population), whereas there are only 2 counties where the rate of African American disenfranchisement is low (less than 0.48% of the African American voting-age population)." On the other hand, "the rate of White disenfranchisement is high in only 10 counties, while the rate of White disenfranchisement is low in 53 counties." Indeed, "[a]mong the 84 counties where there is sufficient data for comparison,

African Americans are denied the franchise due to felony . . . supervision at a higher rate than White people in every single county." With respect to felony convictions in our state courts, "the percentage [in 44 counties] of the African American voting-age population that is denied the franchise due to [felony] supervision . . . is more than three times greater than the comparable percentage of the White population." Taken together, in the trial court's view, the statewide data and county-level data show that "North Carolina's denial of the franchise to persons on felony . . . supervision has an extreme disparate impact on African American people."

The trial court's disparate impact analysis suffers from at least two major flaws. First, the court incorrectly held section 13-1 responsible for the disenfranchisement of individuals on felony supervision. Like other felons, felons in that category have been disenfranchised by Article VI, Section 2(3) of the state constitution, not by section 13-1. If the General Assembly were to repeal section 13-1 tomorrow, Article VI, Section 2(3) would still exclude anyone on felony supervision from the electoral process. Affording the trial court the benefit of the doubt, we assume it meant that the criteria imposed by section 13-1 for felon *re-enfranchisement* operate to the peculiar disadvantage of African Americans.

Second, the trial court erred by not making any findings concerning the racial makeup of the overall felon population. Absent such findings, the court could not determine whether section 13-1 affects African American felons differently than

white felons.[9] Defendants' expert witness, Dr. Keegan Callanan, stated that African Americans constitute forty-two percent of the total felon population. The trial court found that, despite his expertise in the "broad field of political science," Dr. Callanan lacked expertise in the "particular issues" presented by this case and thus that his opinions were entitled to "no weight." The percentage of felons who are classified as African Americans is not a matter of opinion, however, and none of plaintiffs' experts disputed the forty-two percent figure.

On its face, the fact that African Americans make up about forty-two percent of the felon population seems to account for the disproportionate share (forty-two percent) of African Americans on felony supervision. In other words, the trial court's findings provide no reason to believe that section 13-1 re-enfranchises African American felons at a rate that differs from the re-enfranchisement rate for white felons.[10]

---

[9] The dissent contends that our reasoning could have been employed by defenders of the poll tax to argue that, since "African Americans were disproportionately poor . . . wealth inequality, rather than laws implementing poll taxes, was to blame for the disproportionate number of African Americans barred from voting." The dissent misapprehends our position. We do not hold that a court must refuse to credit a plaintiff's disparate impact showing unless the plaintiff can also prove that race alone accounts for the disparity. Rather, we point out that the trial court should have compared the percentages of African American felons and white felons ineligible for re-enfranchisement under section 13-1 with the racial makeup of the total felon population because, unlike the poll tax that all would-be voters had to pay, section 13-1's scope is limited to individuals with felony convictions.

[10] Our disparate impact analysis might have come out differently if, for instance, the evidence had shown that African American felons are significantly more likely than white felons to be placed on felony supervision and thus to be ineligible for re-enfranchisement under section 13-1. On those facts, plaintiffs would have had a credible argument that section 13-1 disproportionately affects African American felons.

Interestingly, if the statistics cited by the trial court amount to proof of disparate impact, the court's own remedy becomes vulnerable to equal protection objections. Since a disproportionately large percentage of felons are African American, it stands to reason that African Americans constitute a disproportionate share of felons currently incarcerated. Thus, if we accept the trial court's logic, extending the franchise to persons on felony supervision but not to felons in jail or prison would almost certainly have a disparate impact on African Americans. It may be that the only practical way to avoid this kind of "disparate impact" is to allow all felons to vote. Were we to construe the Equal Protection Clause in Article I, Section 19 to require such a solution, we would essentially hold that the felon voting prohibition in Article VI, Section 2(3) violates Article I, Section 19. Because we must give effect to both provisions, we may not adopt that interpretation. *See Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997) ("Plaintiffs are essentially reduced to arguing that one section of the North Carolina Constitution violates another. It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself.").

The trial court's findings of fact do not support its ultimate finding that section 13-1 has a disproportionate impact on African Americans. Undisputed evidence in the record but ignored by the trial court undermines the court's position. Accordingly, the trial court's disparate impact finding cannot be relied upon to sustain its conclusion that the General Assembly enacted a new section 13-1 in 1971 and then

amended it in 1973 with the intent of discriminating against African Americans.

### b. *Historical Background*

The "historical background" of a legislative enactment is relevant to discriminatory motive determinations, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. The trial court's order contains extensive findings about the efforts of many white North Carolinians in the nineteenth century to manipulate the legal system to exclude African Americans from the political process. For example, the order discusses an "extensive campaign" in the late 1860s by "White former Confederates" to "convict[ ] African American men of petty crimes *en masse* and whip[ ] them to disenfranchise them 'in advance' of the Fifteenth Amendment." (At the time, receiving an "infamous punishment," such as a public whipping, could disqualify someone from voting.) According to the trial court's order, an 1867 article in the *National Anti-Slavery Standard* reported that "in all country towns the whipping of Negroes is being carried on extensively," the motive being "to guard against their voting in the future." Regarding the 1876 constitutional ban on felon voting and the corresponding 1877 felon voting legislation, the trial court found that "[t]he goal of the felony disenfranchisement regime established in 1876 and 1877, including the 1877 expansion of the onerous 1840 [sic] rights restoration regime to apply to all felonies, was to discriminate against and disenfranchise African American people."

Far from denying the incontrovertible record of racism that mars the history

just described, defendants' legal counsel conceded at trial:

> The plaintiffs here presented a lot of evidence; much of it, if not all of it, all of it, troubling and irrefutable. You can't — I can't say anything about a newspaper report that says what it says. I can't say anything about the history that is in the — in the archives. What I can say is that the evidence . . . presented certainly demonstrates a shameful history of our state's use of laws, and with regard to voting in particular, to suppress the African American population. That I can't — I can't contest that. We never tried to contest that.

The trial court's historical findings say little about the period between 1877 and 1971, the year in which Representatives Johnson and Frye introduced their first proposal to reform the procedures for the restoration of felons' citizenship rights. According to the trial court, "[b]etween 1897 and 1970, the legislature made various small adjustments to the procedure for restoration of rights and recodified that law at N.C.G.S. § 13-1, but the substance of the law was largely unchanged." The court's order does remark that, while "the requirements for rights restoration were slightly relaxed . . . during th[e] period [between 1877 and 1971], none of those changes were likely to help African American people, who had been 'effectively' disenfranchised by this time 'by other means,' including North Carolina's poll tax and literacy test established in 1899."

The pre-1971 events recounted in the trial court's order, along with much of the history summarized at the beginning of this opinion, paint a profoundly troubling portrait of a legal system used time and again to deny African Americans a voice in government by banning or restricting their participation in elections. Yet it is not

those deplorable measures that are in dispute. Plaintiffs have challenged section 13-1 as enacted in 1971 and amended in 1973. The question therefore is whether the trial court rightly understood the relevance of the pre-1971 history to its deliberations on the constitutionality of section 13-1.

The conclusions of law in the trial court's order indicate that the pre-1971 history of felon voting laws in North Carolina was a substantial factor in the outcome. The order asserts that "[t]he legislature cannot purge through the mere passage of time an impermissibly racially discriminatory intent." As legal authority for the importance that it assigns to pre-1971 events, the order cites the 1985 decision of the Supreme Court of the United States in *Hunter v. Underwood*, 471 U.S. 222 (1985). There, the plaintiffs brought an equal protection challenge to a provision in the 1901 Alabama Constitution that disenfranchised persons convicted of certain crimes, some of them minor offenses. *Id.* at 226–29. The evidence overwhelmingly showed that the constitutional convention at which the provision had been adopted "was part of a movement that swept the post-Reconstruction South to disenfranchise blacks." *Id.* at 229. In his opening remarks, the convention's president publicly announced that the goal of the 1901 convention was "to establish white supremacy" in Alabama "within the limits imposed by the Federal Constitution." *Id.* Additionally, "the crimes selected for inclusion in [the 1901 felon voting provision] were believed by the delegates to be more frequently committed by blacks." *Id.* at 227. Influenced by those facts and the provision's ongoing discriminatory impact on African Americans, the Supreme Court

held that the provision violated the federal Equal Protection Clause. *Id*. at 233. The

Court expressly declined to decide, though, whether the provision "would be valid if

enacted today without any impermissible motivation." *Id*.

The *Hunter* decision is plainly not on point. Unlike *Hunter*, this case does not

concern the constitutionality of a now 122-year-old provision adopted at a proceeding

held for the avowed purpose of ensuring white supremacy. As previously observed,

the General Assembly in 1971 repealed Chapter 13 of the General Statutes "in its

entirety" and enacted "a new Chapter 13" with a new section 13-1. An Act to Amend

Chapter 13 of the General Statutes to Require the Automatic Restoration of

Citizenship to Any Person Who Has Forfeited Such Citizenship Due to Committing a

Crime and has Either Been Pardoned or Completed His Sentence, ch. 902, § 1, 1971

N.C. Sess. Laws 1421, 1421. The new Chapter 13 was much friendlier to felons than

its predecessor legislation. It replaced the onerous petition-and-hearing procedure

with a simple oath requirement. *Id*. It also eliminated the waiting period for "[a]ny

person convicted of a [felony when] . . . the Department of Correction at the time of

release recommend[ed] restoration of citizenship." *Id*. The legislature's amendments

to Chapter 13 in 1973 terminated the oath requirement altogether, making the

restoration of citizenship rights automatic upon a felon's unconditional discharge. An

Act to Provide for the Automatic Restoration of Citizenship, ch. 251, § 1, 1973 N.C.

Sess. Laws 237, 237–38. In short, the *Hunter* decision does not apply to a case such

as this one, where the legislature repealed allegedly discriminatory laws and replaced

them with a substantially different statutory scheme.

The trial court should have looked to the Supreme Court's more recent decision in *Abbott v. Perez*, 138 S. Ct. 2305 (2018), which arose from the Texas legislature's adoption in 2011 of new maps for state legislative and congressional districts. *Id.* at 2313. Litigation immediately ensued over claims that the 2011 maps improperly took race into account, and a federal district court in Texas drew up interim maps for the state's upcoming primaries without deferring to the maps enacted by the legislature. *Id.* at 2315–16. Texas challenged the interim maps, and the Supreme Court reversed and remanded, directing the district court to start with the 2011 maps drawn by the Texas legislature and modify them as necessary to comply with federal law. *Id.* at 2316. In 2013 the Texas legislature repealed the original 2011 maps and enacted the interim maps as modified by the district court. *Id.* at 2317. Litigation again ensued, and the district court struck down the 2013 maps, reasoning that (1) the 2011 legislature had intended the original maps to discriminate on the basis of race and (2) the 2011 legislature's discriminatory intent should be attributed to the 2013 legislature because the latter "had failed to engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans." *Id.* at 2318 (internal quotation marks and citations omitted).

Texas appealed again, and the Supreme Court reversed the district court a second time, primarily because the maps adopted by the 2013 legislature were not the original 2011 maps. *Id.* at 2325. "Under these circumstances," said the Court,

"there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id.* Furthermore, the Court explained, a finding of past discrimination did not alter the burden of proof or the presumption of legislative good faith. *Id.* at 2324–25 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." (alteration in original) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion))). The district court thus erred by "revers[ing] the burden of proof" and "impos[ing] on the State the obligation of proving that the 2013 Legislature had experienced a true 'change of heart' and had 'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.' " *Id.* at 2325 (third alteration in original) (quoting *Perez v. Abbott*, 274 F. Supp. 3d 624, 649 (D.C. Cir. 2017)). The district court should have held the plaintiffs "to their burden of overcoming the presumption of [legislative] good faith and proving discriminatory intent." *Id.* Examining the available evidence, the Supreme Court held that it was "plainly insufficient to prove that the 2013 Legislature acted in bad faith and engaged in intentional discrimination." *Id.* at 2327. The "direct evidence" of intent in the record revealed that the 2013 legislature adopted the modified interim maps for the acceptable purpose of shortening any redistricting litigation that might follow. *Id.* Inasmuch as those maps had already been approved by the district court in earlier litigation, the 2013 legislature had "good reason to believe that [they] were legally sound." *Id.* at 2328.

When applied to this case, *Abbott* leads us to conclude that the trial court erred

as a matter of law by requiring the General Assembly to prove that it had purged past discriminatory intent prior to its enactment of a new section 13-1 in 1971. While it would be an overstatement to say that the trial court should have ignored the pre-1971 history recounted in its order, plaintiffs' claims must finally rise or fall on whether their evidence overcomes the presumption of legislative good faith and proves that discriminatory intent motivated the legislators who voted in the early 1970s to reduce the barriers to felon re-enfranchisement. *See id.* at 2327 ("[W]e do not suggest . . . that the intent of the 2011 Legislature is irrelevant . . . . Rather, . . . the intent of the 2011 Legislature . . . [is] relevant to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the 2013 Legislature.").

Before proceeding, we observe that the trial court's order omits a major historic development close in time to the General Assembly's 1971 and 1973 rewrites of section 13-1: the legislature's approval in 1969 of what became our current state constitution. As noted above, that document incorporated equal protection and nondiscrimination guarantees that had not appeared in our previous state constitutions. *State Constitution* at 45, 68. In other words, not long before it took action to dismantle procedural obstacles to the restoration of eligible felons' citizenship rights, the General Assembly adopted a draft constitution that explicitly prohibited government discrimination based on race, color, religion, or national origin. The trial court should have considered the relevance of this event to plaintiffs'

racial discrimination claims.

c. *Legislative History*

For a court conducting an *Arlington Heights* inquiry, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. The principal findings of fact in the trial court's order that chronicle the events of 1971 and 1973 read as follows:

> 42.  In 1971, Reps. Joy Johnson and Henry Frye proposed a bill amending section 13-1 to eliminate the petition and witness requirement and to "automatically" restore citizenship rights to anyone convicted of a felony "upon the full completion of his sentence." But their proposal was rejected. Their proposed bill was amended to retain section 13-1's denial of the franchise to people living in North Carolina's communities. In particular, the African American legislators' 1971 proposal was successfully amended in committee to specifically require the completion of "any period of probation or parole"—words that had not appeared in Rep. Johnson and Frye's original proposal—and then successfully amended again to require "two years [to] have elapsed since release by the Department of Corrections, including probation or parole." The amendments also deleted the word "automatically" and added a requirement to take an oath before a judge to obtain rights restoration. The 1971 revision to section 13-1 passed as amended. It thus required people with felony convictions to wait two years from the date of the completion of their probation or parole, and then to go before a judge and take an oath to secure their voting rights.
>
> 43.  Rep. Frye explained on the floor of the North Carolina House of Representatives in July 1971 that "he

preferred the bill's original provisions which called for automatic restoration of citizenship when a felon had finished his prison sentence, but he would go along with the amendment if necessary to get the bill passed."

44. In 1973, the three African American legislators were able to convince their 167 White colleagues to further amend the law to eliminate the oath requirement and to eliminate the two-year waiting period after completion of probation and parole, but they were not able to reinstate voting rights upon release from incarceration. Senator Michaux explained, with respect to the 1973 revision, that "[o]ur aim was a total reinstatement of rights, but we had to compromise to reinstate citizenship voting rights only after completion of a sentence of parole or probation." "To achieve even that victory, we vehemently argued and appealed to our colleagues that if you had served your time, you were entitled to your rights. Ultimately, what we achieved was a compromise."

45. The record evidence is clear and irrefutable that the goal of these African American legislators and the NC NAACP was to eliminate section 13-1's denial of the franchise to persons released from incarceration and living in the community, but that they were forced to compromise in light of opposition by their 167 White colleagues to achieve other goals, such as eliminating the petition requirement. Both Henry Frye's statement on the House floor and Senator Michaux's affidavit make[ ] clear that the African American legislators wanted disenfranchisement to end at the conclusion of "prison" or "imprisonment." But as Senator Michaux explained: "We understood at the time that we would have to swallow the bitter pill of the original motivations of the law—the disenfranchisement at its core was racially motivated—to try to make the system practiced in North Carolina somewhat less discriminatory and to ease the burdens placed on those who were disenfranchised by the state."

. . . .

49. Rep. Jim Ramsey, who chaired the House

> Committee offering the committee substitute adding back in the words "probation and parole," openly acknowledged in 1971 that the provision governing restoration of voting rights was "archaic and inequitable." Rep. Ramsey provided no explanation for the Committee's decision to nonetheless preserve the existing law's disenfranchisement of people after their release from any incarceration.

(First and second alterations in original) (citations omitted).

The only evidence cited by the trial court in the above findings to show that racial discrimination motivated white legislators in 1971 and again in 1973 consists of (1) committee amendments to the initial 1971 bill and (2) statements by three legislators. It does not take much inspection to perceive the meagerness of this evidence. We have already seen that, even as amended by committee, the 1971 legislation streamlined the rights restoration process for all eligible felons by, *inter alia*, substituting an oath requirement for the time-consuming and complicated petition-and-hearing procedure.

A closer examination of the contemporaneous records pertaining to the 1973 amendments to section 13-1 further undercuts the trial court's findings. To begin with, though the trial court ignored this fact, the automatic restoration bill introduced by Representatives Johnson, Frye, and Michaux in 1973 did *not* cover individuals on felony supervision; rather, it expressly *excluded* felons on probation or parole. Moreover, the record shows that white legislators voted down attempts to weaken the legislation. They rejected, for instance, an amendment that would have retained the oath requirement. The final legislation enacted by the General Assembly

in 1973 did not differ materially from the original bill. It ended the waiting period and mandated automatic rights restoration for eligible felons. An Act to Provide for the Automatic Restoration of Citizenship, ch. 251, § 1, 1973 N.C. Sess. Laws 237, 237–38.

With the enactment of the 1973 amendments to Chapter 13, Representatives Johnson, Frye, and Michaux obtained everything they had sought, save automatic restoration for individuals on felony supervision, and their 1973 bill did not even propose automatic restoration for felons in that category. Especially when viewed through the presumption of legislative good faith, the unwillingness of their white colleagues to compromise on this one issue hardly substantiates a charge of racism. As Senator Michaux himself testified during his deposition on 24 June 2020, "everything that comes out of that legislature is a compromise." *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017) ("Passing a law often requires compromise, where even the most firm public demands bend to competing interests.").

Similarly, the legislators' statements relied on by the trial court provide a thoroughly inadequate foundation for its conclusion that racism drove the legislature's refusal to restore the rights of individuals on felony supervision. As the Supreme Court has explained:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk

the possibility of misreading Congress' purpose. *It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.* What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*United States v. O'Brien*, 391 U.S. 367, 383–84 (1968) (emphasis added) (footnote omitted).

The statements by Representatives Frye and Ramsey are the only ones cited by the trial court that were made during the General Assembly's consideration of the 1971 legislation. They appeared in a brief 1971 newspaper article reporting on the House's debate. Significantly, there is no mention of race in the article, much less any allegation that racism played a role in the legislation's development.

The trial court's order does not quote or reference any statements made by legislators during the General Assembly's consideration of the 1973 amendments to Chapter 13. The statements by Senator Michaux quoted in Findings of Fact 44 and 45 come from an affidavit executed on 7 May 2020, roughly 50 years after the legislative actions that plaintiffs challenge. While the affidavit broadly alleges that many state legislators held racist views in 1973, it contains few details and speculates a great deal about the motives of Senator Michaux's white colleagues. In recounting the defeat of a "Landlord-Tenant rights bill[,]" for instance, Senator Michaux opined, "[The] bill . . . was ultimately defeated based, I believe, on bias in the legislative body."

Taken at face value, the comments by Representatives Frye and Ramsey do not so much as imply that racism had anything to do with amendments to the 1971 bill introduced by Representatives Johnson and Frye. In any case, "floor statements by individual legislators rank among the least illuminating forms of legislative history." *SW Gen., Inc.,* 580 U.S. at 307. The only statements by a legislator that accuse the white legislators who voted to amend section 13-1 in 1973 of racially discriminatory motives were made by Senator Michaux nearly half a century after the fact. The probative value of those statements is diminished by the length of time between the statements and the events they recount, as well as the general and speculative quality of the statements. The trial court should have heeded the warning in *O'Brien* against striking down a law based on the comments of a few legislators, however respected and distinguished they may be. *See O'Brien*, 391 U.S. at 383–84.

Finally, the trial court's inference of discriminatory intent from the legislative history seems curiously at odds with the cumulative effect of the 1971 and 1973 legislation, which has been to restore automatically the citizenship rights of all felons, whatever their race, who have completed their sentences. To the degree that African Americans make up a disproportionate share of the felon population, this sea change in the law may well have led to a disproportionate number of African American felons regaining the right to vote. In light of the legislation's impact and the absence of reliable evidence of discriminatory intent, the legislative history in this case did little, if anything, to help plaintiffs prove that racial prejudice motivated the white

legislators who reformed our felon re-enfranchisement statutes in 1971 and 1973.

### d. *Procedural Sequence*

"Departures from the normal procedural sequence might also afford evidence that improper purposes are playing a role" in a government action. *Arlington Heights*, 429 U.S. at 267. In this case, there is no contention by plaintiffs or finding by the trial court that the General Assembly deviated from its normal procedures during its consideration and enactment of felon rights legislation in 1971 and 1973. Like the other *Arlington Heights* factors, this one favors defendants.

### e. Arlington Heights *Conclusion*

The trial court misapplied the *Arlington Heights* factors and relied on manifestly insufficient evidence to bolster its conclusion that racial discrimination prompted the General Assembly in 1971 and again in 1973 not to restore the citizenship rights of persons on felony supervision. When viewed through the presumption of legislative good faith, as it must be, the statistical and historical evidence presented by plaintiffs does not show racial discrimination "to have been a 'substantial' or 'motivating' factor behind" the 1971 repeal and replacement of section 13-1 or the 1973 amendments to that statute. *Hunter*, 471 U.S. at 228. Consequently, the burden of proof did not shift to defendants "to demonstrate that the law[s] would have been enacted without this factor." *Id*. The trial court should have rendered judgment for defendants on plaintiffs' claim that section 13-1 discriminates against African Americans in violation of our state Equal Protection Clause.

**B. Wealth-Based Classification**

State law makes the payment of court costs, fines, and restitution a condition of probation, parole, and post-release supervision. N.C.G.S. §§ 15A-1343(b)(9) (2021) (probation); 15A-1374(b)(11a)–(11b) (2021) (parole); 15A-1368.4(e)(11)–(12) (2021) (post-release supervision). In its order granting partial summary judgment to plaintiffs, the trial court offered an example of how this requirement can interact with section 13-1 to postpone the restoration of a felon's right to vote: "[P]robation may be extended for up to five years, then an additional three with the consent of the probationer, to allow time for the compliance with the financial obligation of restitution. The impact is that a person remains disenfranchised for up to eight years because he has been unable to pay . . . ." The court concluded that, "by requiring an unconditional discharge that includes payments of all monetary obligations imposed by the court, [section] 13-1 creates a wealth classification" in violation of the Equal Protection Clause in Article I, Section 19.

Defendants argue that the trial court "relied on the . . . mistaken premise that felons have a fundamental right to vote to apply strict scrutiny to [p]laintiffs' claim that [s]ection 13-1 creates an impermissible wealth classification." Defendants further contend that "[s]ection 13-1 does not create a wealth classification[,]" and even if it did, the trial court erred in subjecting that classification to strict scrutiny. Plaintiffs would have us affirm the trial court's ruling, contending that equal protection " 'bars a system which excludes' from the franchise those unable to pay a

fee[,]' " quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966), and that the trial court rightly applied strict scrutiny to their wealth classification claim.

"The Equal Protection Clause necessarily operates as a restraint on certain activities of the State that either create classifications of persons or interfere with a legally recognized right." *Blankenship*, 363 N.C. at 521–22, 681 S.E.2d at 762. For most equal protection claims, this Court employs one of three tiers of scrutiny. "The upper tier of equal protection analysis requiring strict scrutiny of a governmental classification applies only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *White v. Pate*, 308 N.C. 759, 766, 304 S.E.2d 199, 204 (1983). When a statute draws such a classification, strict scrutiny "requires that the government demonstrate that the classification it has imposed is necessary to promote a compelling governmental interest." *Id.*

On the other hand, when a statute does not burden a fundamental right or peculiarly disadvantage a suspect class, we typically apply rational basis review, "the lowest tier of review." *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 181, 594 S.E.2d 1, 16 (2004). A statute survives rational basis review so long as the classification at issue "bear[s] some rational relationship to a conceivable legitimate interest of the government." *White*, 308 N.C. at 766–67, 304 S.E.2d at 204; *see also Rhyne*, 358 N.C. at 180–81, 594 S.E.2d at 15 ("Rational basis review is 'satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the

classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.' " (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992))).

We have applied intermediate scrutiny to one kind of equal protection claim under Article I, Section 19. In *Blankenship*, we held that intermediate scrutiny is the proper standard of review for claims that superior court districts drawn by the General Assembly deny citizens "the right to vote in superior court elections on substantially equal terms." 363 N.C. at 525–26, 681 S.E.2d at 765. Under intermediate scrutiny, "[j]udicial districts will be sustained if the legislature's formulations advance important governmental interests unrelated to vote dilution and do not weaken voter strength more than necessary to further those interests." *Id.* at 527, 681 S.E.2d at 766.

Although "[t]he right to vote on equal terms is a fundamental right[,]" *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990), the suffrage provisions in Article VI limit the scope of that right. Pursuant to Article VI, Section 1, for instance, no one under the age of eighteen has the right to vote.[11] We thus would not apply strict scrutiny to a claim that denying

---

[11] "Every person born in the United States and every person who has been naturalized, 18 years of age, and possessing the qualifications set out in this Article, shall be entitled to vote at any election by the people of the State, except as herein otherwise provided." N.C. Const. art. VI, § 1.

the vote to sixteen-year-olds violates the Equal Protection Clause. Likewise, the default rule under Article VI, Section 2(3) is that felons do not have the right to vote. The provision authorizes the General Assembly to adopt a process by which felons may regain that right, but it leaves the details to the legislature's sound discretion. Usually, then, laws that set out the process by which felons may have their rights restored do not trigger strict scrutiny. *See Jones v. Governor of Fla.*, 975 F.3d 1016, 1030 (11th Cir. 2020) (en banc) ("[A]bsent a suspect classification that independently warrants heightened scrutiny, laws that govern felon disenfranchisement and reenfranchisement are subject to rational basis review.").

The trial court applied strict scrutiny to section 13-1 because the statute conditions felons' eligibility to vote on their ability to pay any court costs, fines, or restitution owed. According to the court, "when a wealth classification is used to restrict the right to vote or in the administration of justice, it is subject to heightened scrutiny, not the rational basis review urged by Defendants in this case."

The trial court got the standard wrong. The Supreme Court case cited by the court to justify its use of strict scrutiny did not concern voting rights. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 107 (1996) (holding that a state may not "condition appeals from trial court decrees terminating parental rights on the affected parent's ability to pay record preparation fees"). Moreover, federal appellate courts that have confronted claims akin to plaintiffs' wealth classification argument have not resorted to strict

scrutiny.[12]

In *Jones*, the United States Court of Appeals for the Eleventh Circuit, sitting en banc, used rational basis review to evaluate an equal protection challenge to Florida laws that allowed felons to regain their voting rights upon completion of their sentences, "including imprisonment, probation, and payment of any fines, fees, costs, and restitution." 975 F.3d at 1025. The court noted that under the federal Equal Protection Clause felons do not have a fundamental right to vote and wealth is not a suspect classification. *Id*. at 1029–30; *see also Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (stating that the plaintiffs "cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of" the Supreme Court's decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974)); *Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("It is undisputed that . . . the right of felons to vote is not fundamental."). The court distinguished Florida's requirement that felons pay fines, fees, costs, and restitution to regain their voting rights from a poll tax. "Unlike [a] poll tax . . . , that requirement is highly relevant to voter qualifications. It promotes full rehabilitation of returning citizens and ensures full satisfaction of the punishment imposed for the crimes by which felons forfeited the right to vote." *Jones*, 975 F.3d at 1031 (citation omitted); *see also Harvey*, 605 F.3d at 1080 ("That restoration of [the plaintiff-felons'] voting rights

---

[12] The dissent argues that strict scrutiny should apply to plaintiffs' wealth classification claim but does not cite a single case that supports the application of strict scrutiny in this context.

requires them to pay all debts owed under their criminal sentences does not transform their criminal fines into poll taxes.").

The Eleventh Circuit further reasoned:

> The only classification at issue is between felons who have completed all terms of their sentences, including financial terms, and those who have not. This classification does not turn on membership in a suspect class: the requirement that felons complete their sentences applies regardless of race, religion, or national origin. Because this classification is not suspect, we review it for a rational basis only.

*Jones*, 975 F.3d at 1030; *see also Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (applying rational basis review to felon re-enfranchisement law); *Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010) (applying rational basis review to statutes disenfranchising felons); *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) ("[T]he standard of equal protection scrutiny to be applied when the state makes classifications relating to disenfranchisement of felons is the traditional rational basis standard."); *Shepherd v. Trevino*, 575 F.2d 1110, 1114–15 (5th Cir. 1978) (holding that state laws on felon re-enfranchisement receive rational basis review).

Employing rational basis review, the Eleventh Circuit held that Florida's felon re-enfranchisement laws were reasonably related to legitimate government interests. *Jones*, 975 F.3d at 1035. The state could rationally have believed "that felons who have completed all terms of their sentences, including paying their fines, fees, costs, and restitution, are more likely to responsibly exercise the franchise than those who have not." *Id.*

We find the Eleventh Circuit's approach in *Jones* persuasive. The trial court should have subjected section 13-1 to rational basis review on plaintiffs' claim that the statute unconstitutionally conditions felon re-enfranchisement on the capacity of felons to satisfy the financial terms of their sentences. The statute unquestionably survives rational basis review because the General Assembly could reasonably have believed in 1971 and 1973 that felons who pay their court costs, fines, or restitution are more likely than other felons to vote responsibly. The legislature could also have rationally viewed the requirement as an incentive for felons to take financial responsibility for their crimes.

In their brief to this Court, plaintiffs argue that, under our current re-enfranchisement laws, "[t]wo North Carolinians could be convicted of the same crime, receive the same sentence, and each complete all other terms of their probation, but the person with financial means to pay will be re-enfranchised while the person without will remain barred from voting." Even if that assertion is correct, it does not save plaintiffs' equal protection claim. Practically every law affects those who come within its ambit differently based on their individual situations. The question under rational basis review is whether distinctions drawn by the law are reasonable and connected to a legitimate government interest. When it comes to section 13-1's requirement that felons satisfy the conditions of their felony supervision, the answer to that question is undoubtedly yes. Once again, we find the Eleventh Circuit's analysis convincing:

> To be sure, the line Florida drew might be imperfect. The classification may exclude some felons who would responsibly exercise the franchise and include others who are arguably less deserving. But Florida was not required to draw the perfect line nor even to draw a line superior to some other line it might have drawn. The Constitution requires only a rational line. The line between felons who have completed their sentences and those who have not easily satisfies that low bar.

*Jones*, 975 F.3d at 1035.

We should add that, even if the scenario posed by plaintiffs were constitutionally problematic, it would not be enough to sustain their equal protection claim. Plaintiffs brought a facial challenge to section 13-1, "the most difficult challenge to mount successfully." *Hart v. State*, 368 N.C. 122, 131, 774 S.E.2d 281, 288 (2015). To prevail, they must show that "there are *no circumstances* under which the statute might be constitutional." *Beaufort Cnty. Bd. of Educ. v. Beaufort Cnty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009) (emphasis added). "The fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998).

Section 13-1 does not impermissibly condition the right to vote on a felon's ability to pay whatever court costs, fines, or restitution the felon may owe. Because this equal protection claim lacks merit, the trial court should have granted summary judgment for defendants. *See* N.C.G.S. § 1A-1, Rule 56(c) (2021) ("Summary judgment, when appropriate, may be rendered against the moving party.").

## C. Property Qualifications

The Property Qualifications Clause in our state constitution declares: "As political rights and privileges are not dependent upon or modified by property, no property qualification shall affect the right to vote or hold office." N.C. Const. art. I, § 11. In granting summary judgment for plaintiffs on their Property Qualifications Clause claim, the trial court reasoned that, "when legislation is enacted that restores the right to vote, thereby establishing qualifications which certain persons must meet to exercise their right to vote, such legislation must not do so in a way that makes the ability to vote dependent on a property qualification." The trial court opined that section "13-1 does exactly that" by making the re-enfranchisement of felons depend on whether they satisfy the financial terms of their sentences.

Defendants argue that section 13-1 does not violate the Property Qualifications Clause because "[t]he requirement that felons complete their sentences, including financial aspects of their sentences, is a predicate for felons having their rights *restored*, not a qualification for *exercising* their rights." In defendants' view, "[t]he Constitution's demand that 'political rights and privileges' not be made 'dependent upon or modified by property' is inapplicable to felons who have no political right to vote until [that right is] reinstated by [s]ection 13-1." Defendants also maintain that the trial court's interpretation conflicts with the original understanding of property qualifications. Plaintiffs argue in response that money constitutes a form of property and consequently the Property Qualifications Clause prohibits the state from

withholding the franchise over a felon's nonpayment of court costs, fines, or restitution.

The Property Qualifications Clause does not exist in a textual vacuum. It forbids the imposition of property qualifications on "the right to vote," but it does not define that right. Other provisions in the state constitution give that right content. Thus, for example, Article I, Section 9 guarantees anyone entitled to vote in North Carolina the right to do so in elections that are held frequently. *See* N.C. Const. art. I, § 9 ("[E]lections shall be often held."). Under Article I, Section 10, those frequent elections must be conducted "free from interference or intimidation." *State Constitution* at 56; *see also* N.C. Const. art. I, § 10 ("[E]lections shall be free."). Article VI sets out the qualifications that individuals must satisfy to have the right to vote in the frequent and free elections mandated by Article I, Sections 9 and 10. In general, as we have seen, that right belongs to anyone who has reached eighteen years of age and meets certain residency requirements. N.C. Const. art. VI, § 1, § 2(1)–(2).

Article VI expressly disqualifies from voting, however, anyone "adjudged guilty of a felony . . . unless that person shall first be restored to the rights of citizenship in the manner prescribed by law." *Id.* § 2(3). The obvious import of these words is that felons whose rights have not been restored as provided by law have no right to vote under our state constitution. Put differently, felon re-enfranchisement through section 13-1 "is not a . . . right; it is a mere benefit that" the General Assembly could "choose to withhold entirely." *Harvey*, 605 F.3d at 1079. Because felons whose

citizenship rights have not been restored have no state constitutional right to vote, requiring them to fulfill the financial terms of their sentences as a condition of re-enfranchisement cannot be said to violate the Property Qualifications Clause. Financial obligations imposed on individuals who already lack the right to vote simply do not trigger that provision.

The historical background of the Property Qualifications Clause lends weight to our interpretation of the provision's scope. Under the 1776 constitution, all freemen aged twenty-one or older who satisfied a one-year residency requirement and had paid "public taxes" could vote for members of the state house. N.C. Const. of 1776, Declaration of Rights, § VIII. When it came to voting for a member of the state senate, though, a freeman could not vote unless he met the residency requirement and was "possessed of a freehold within the same county of fifty acres of land for six months next before, and at the day of election." *Id.* § VII. The 1776 constitution also imposed property ownership qualifications on the governor and members of the legislature.[13]

The property qualifications in the 1776 constitution were meant to ensure that the people who voted and those for whom they voted had a personal investment in the governance of the state. "Although [Article I, Section 11 of the current state

---

[13] "[M]embership in the senate was restricted to men with 'not less than three hundred acres of land in fee,' while each member of the house of commons had to hold 'not less than one hundred acres of land in fee, or for the term of his own life.' The governor had to be a man of still more substantial property, possessed of 'a freehold in lands and tenements, above the value of one thousand pounds.'" John V. Orth, *Fundamental Principles in North Carolina Constitutional History*, 69 N.C. L. Rev. 1357, 1361 (1991) (footnotes omitted) (citing N.C. Const. of 1776, §§ 5–6, 15).

constitution] confidently declare[s] that politics and property are not related . . . , the fact was not self-evident to the generation that made the Revolution. On the contrary, the state's 1776 constitution excluded paupers from the franchise: Those without property had, it was thought, no stake in society." *State Constitution* at 57.

The 1835 amendments to the state constitution left the property qualifications intact. "In 1857, voters approved the only amendment submitted to them between 1836 and [their ratification of the 1868 constitution]. The amendment . . . abolished the 50-acre land ownership requirement for voters to cast ballots in state senate races."[14] John L. Sanders, *Our Constitutions: An Historical Perspective*, https://www.sosnc.gov/static_forms/publications/North_Carolina_Constitution_Our_ Co.pdf (last visited Apr. 14, 2023). The 1857 amendment did not alter property qualifications for governor and members of the legislature, which remained in effect until after the Civil War. *State Constitution* at 57.

The Property Qualifications Clause that now resides in Article I, Section 11 first appeared in the 1868 constitution. It banned—and continues to ban—property qualifications for voting or officeholding. "[A] milestone on the road to modern democracy[,]" the provision owes its existence to Republican delegates to the 1868 constitutional convention, who insisted "that popular sovereignty not be limited by

---

[14] "Every free white man of the age of twenty-one years, being a native or naturalized citizen of the United States and who has been an inhabitant of the State for twelve months immediately preceding the day of an election, and shall have paid public taxes, shall be entitled to vote for a member of the senate for the district in which he resides." N.C. Const. of 1776, amends. of 1857.

property." *Id.*

The requirement that felons pay what they owe differs in kind and purpose from the 1776 constitution's property qualifications. As we have seen, the framers of the 1776 constitution restricted voting and certain offices to owners of real property in the belief that propertyless individuals lacked a stake in the conduct of government affairs. Insisting that felons *pay* their court costs, fines, and restitution is not the same thing as mandating that they *own* real or personal property in particular amounts. Nothing prohibits a relative, for instance, from paying a felon's court costs. Moreover, section 13-1's re-enfranchisement criteria are not premised on the outdated notion that the poor have no interest in how the state is run.

Plaintiffs cite *Wilson v. Board of Aldermen*, 74 N.C. 748 (1876), for the proposition that money constitutes property for purposes of the Property Qualifications Clause. There, the plaintiff disputed the constitutionality of a provision in the City of Charlotte's charter that endowed the city with the power to tax his bonds and income. *Id.* at 748–49. The plaintiff based his argument on Article VII, Section 9 of the 1868 constitution, which directed that any property taxes levied by counties or municipalities be "uniform and *ad valorem*" *Id.* at 754 (quoting N.C. Const. of 1868, art. VII, § 9). The plaintiff interpreted Article VII, Section 9 to confine local government property taxes to tangible property. *Id.* We disagreed, pointing out that other provisions in the 1868 constitution, such as the Property Qualifications Clause, used the term "property" more generally. *Id.* at 755–56.

The *Wilson* case does not lead to the conclusion that section 13-1 violates the Property Qualifications Clause. While money is a form of property, the Property Qualifications Clause bans laws that make property ownership a condition of voting, and we have just explained that section 13-1 does not mandate that felons own property.[15]

The trial court erred in ruling that section 13-1 violates the Property Qualifications Clause. When read alongside related constitutional provisions, the Property Qualifications Clause does not bar the General Assembly from requiring that felons satisfy the financial terms of their sentences before they regain the franchise. The history behind the Property Qualifications Clause reenforces this view. Section 13-1 does not implicate "the purposes sought to be accomplished by [the] promulgation" of the Property Qualifications Clause. *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980). Defendants were entitled to summary judgment on this claim.

**D. Free Elections Clause**

In its final order, the trial court ruled that section 13-1 "violates the Free Elections Clause [in Article I, Section 10 of the North Carolina Constitution] by preventing elections that ascertain the will of the people." The trial court reasoned that "North Carolina's elections do not faithfully ascertain the will of the people when

---

[15] The dissent incorrectly asserts that we construe the Property Qualifications Clause to refer to real property only.

such an enormous number of people living in communities across the state—over 56,000 individuals [on felony supervision]—are prohibited from voting."[16]

Defendants argue that section 13-1 does not violate the Free Elections Clause because (1) felons have no right to vote under the state constitution and thus fall outside the scope of the Free Elections Clause; (2) section 13-1 cannot be said to contravene the Free Elections Clause because it is more lenient on felons than the version of section 13-1 that was in effect when voters ratified the current state constitution in 1970; and (3) "[p]laintiffs have failed to prove that [s]ection 13-1 constrains any voter's choice in voting for particular candidates." According to plaintiffs, the Free Elections Clause requires allowing individuals on felony supervision to vote because elections must "reflect to the greatest extent possible the will of *all* people living in North Carolina communities."

We hold that section 13-1 does not violate the Free Elections Clause in Article I, Section 10. Like the Property Qualifications Clause in Article I, Section 11, the Free Elections Clause must be harmonized with the provisions of Article VI. Pursuant to Article VI, Section 2(3), only those felons whose citizenship rights have been restored in the manner prescribed by law have the right to vote. Accordingly, the Free Elections Clause is not violated when felons whose rights have not been restored are

---

[16] The trial court further concluded that section 13-1 "strikes at the core of the Free Elections Clause . . . because of its grossly disproportionate effect on African American people." We explained earlier in this opinion why the trial court's disparate impact findings are unreliable.

excluded from the electoral process. In plain English, it is not unconstitutional merely to deny the vote to individuals who have no legal right to vote.

The historical background of the Free Elections Clause substantiates our holding. Our opinion issued today in *Harper v. Hall*, No. 413PA21-2 (N.C. Apr. 28, 2023), discusses that background in detail, so we need not duplicate the discussion here. Suffice to say that a free elections guarantee has appeared in each of our state's constitutions, the first of which declared that "elections of members, to serve as Representatives in General Assembly, ought to be free." N.C. Const. of 1776, Declaration of Rights, § VI. The wording of the free elections guarantee in the 1776 constitution echoes a parallel provision in the 1689 Bill of Rights adopted by the English Parliament following the overthrow of King James II. *See* Bill of Rights 1689, 1 W. & M. Sess. 2, ch. 2, § I, cl. 13 ("[E]lection of Members of Parlyament ought to be free."); *State Constitution* at 56 ("The word ['free' as used in the Free Elections Clause] originally derives . . . from the English Declaration of Rights (1689)[.]").

As explained in *Harper*, "the drafters of the English Bill of Rights sought to secure a 'free [P]arliament,' a Parliament where the electors could vote for candidates of their choice, and the members, once elected, could legislate according to their own consciences without threat of intimidation or coercion from the monarch." *Harper*, slip op. at 111–12 (alteration in original) (quoting Michael Barone, *Our First Revolution: The Remarkable British Upheaval that Inspired America's Founding Fathers* 230 (2007)) The framers of our 1776 constitution hoped to achieve a similar

goal: state legislative elections "free from interference or intimidation." *State Constitution* at 56.

This Court's decisions interpreting the Free Elections Clause further illuminate the contours of that provision. In *Swaringen v. Poplin*, 211 N.C. 700, 191 S.E. 746 (1937), the plaintiff alleged that the county board of elections had fraudulently altered the results of his county commissioner race, thereby depriving him of office. *Id.* at 700–01, 191 S.E. at 746. We rejected the defendant's argument that the complaint failed to state a claim and held that, under the Free Elections Clause, "[a] free ballot and a fair count must be held inviolable to preserve our democracy." *Id.* at 702, 191 S.E. at 747. We thus construed the Free Elections Clause to prohibit fraudulent vote counts.

In *Clark v. Meyland*, 261 N.C. 140, 134 S.E.2d 168 (1964), the plaintiff challenged a statutory requirement that voters seeking to change their party affiliation take an oath promising to support their new party's nominees until "in good faith" they changed their party affiliation again. *Id.* at 141, 134 S.E.2d at 169. We held that the portion of the oath requiring support for future candidates violated the Free Elections Clause because "[i]t denie[d] a free ballot—one that is cast according to the dictates of the voter's judgment." *Id.* at 143, 134 S.E.2d at 170. We explained that "the Legislature [was] without power to shackle a voter's conscience by requiring the objectionable part of the oath as a price to pay for his right to participate in his party's primary." *Id.* In summary, "[b]ased upon . . . this Court's

precedent, the free elections clause means a voter is deprived of a 'free' election if (1) a law prevents a voter from voting according to one's judgment, or (2) the votes are not accurately counted." *Harper*, slip op. at 117 (citations omitted).

"[A] constitution cannot violate itself[,]" *Leandro*, 346 N.C. at 352, 488 S.E.2d at 258, so denying the franchise to felons as required by Article VI, Section 2(3) cannot be a violation of the Free Elections Clause. Furthermore, excluding felons whose rights have not been restored from the electoral process does not expose our elections to the sort of interference, intimidation, fraud, or infringements on conscience that the Free Exercise Clause exists to prevent. The trial court therefore erred in ruling that section 13-1 contravenes the Free Elections Clause.

## E. Fundamental Right to Vote

Lastly, the trial court concluded that section 13-1 unconstitutionally "interferes with the fundamental right to vote on equal terms[,]" reasoning that felons "on felony supervision share the same interest as . . . North Carolina residents who have not been convicted of a felony or [felons] who have completed their supervision." We have already concluded that felons have no fundamental right to vote, as Article VI, Section 2(3) expressly divests them of this right upon conviction. Contrary to the trial court's reasoning, felons are not "similarly situated" to non-felons when it comes to voting; our state constitution could not be clearer on this point.

## V. Disposition

Plaintiffs failed to prove the unconstitutionality of section 13-1 beyond a

reasonable doubt. The General Assembly did not engage in racial discrimination or otherwise violate the North Carolina Constitution by requiring individuals with felony convictions to complete their sentences—including probation, parole, or post-release supervision—before they regain the right to vote. We therefore reverse the trial court's grant of summary judgment and declaratory and injunctive relief to plaintiffs and remand this case to the trial court for dismissal of plaintiffs' claims with prejudice.

REVERSED AND REMANDED.

Justice EARLS dissenting.

The majority's decision in this case will one day be repudiated on two grounds. First, because it seeks to justify the denial of a basic human right to citizens and thereby perpetuates a vestige of slavery, and second, because the majority violates a basic tenant of appellate review by ignoring the facts as found by the trial court and substituting its own. *See, e.g., State v. Taylor*, 379 N.C. 589, 608 (2021) ("[A]n appellate court is not entitled to 'make its own findings of fact and credibility determinations, or overrule those of the trier of fact.' " (quoting *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 44 n.16 (2020))).

With regard to the first and most serious issue, the majority interprets the North Carolina Constitution to reduce the humanity of individuals convicted of felony offenses to the point of cruelty: People who are convicted of felony offenses are no longer people, they are felons.[1] The majority believes that, as felons, they are not free even after their sentences are complete, they are merely felons for the rest of their lives. At about the same time that the state constitution was amended to disenfranchise all Blacks, both those who were slaves and those who were free, this Court held that "[t]he power of the master must be absolute to render the submission

---

[1] The rationale for denying the franchise to returning citizens was questioned at the time the statute at issue here was under consideration. *See, e.g.,* North Carolina Law Review, *Notes*, 50 N.C. L. Rev. 903, 910 (1972) ("If the prisoner is worthy of being released to the community he should be made to feel that he is ready to rejoin society as a participant and not as an outsider.").

of the slave perfect." *State v. Mann,* 13 N.C. (2 Dev.) 263, 266 (1829). The Court found that proposition to be inherent in the institution of slavery and professed no power to "chang[e] the relation in which these parts of our people stand to each other." *Id.* at 267. Today, the Court again consigns a portion of the state's population to a less than free status, unable to participate in the fundamental exercise of self-governance upon which democracy is based. *See Blankenship v. Bartlett*, 363 N.C. 518, 522 (2009); *see also Reynolds v. Sims*, 377 U.S. 533, 554–55 (1964) (declaring that the right to vote is a fundamental right, preservative of all other rights). As preservative of all other rights, the right to vote also recognizes the inherent humanity of every adult citizen. The state constitution contemplates that the right to vote, along with all rights of citizenship, shall be restored to people who commit felony offenses. N.C. Const. art. VI, § 2(3). The only question in this case is whether the statute that prescribes how restoration is accomplished, N.C.G.S. § 13-1, unconstitutionally discriminates against individuals with felony convictions. The trial court heard extensive evidence, made detailed findings of fact, and applied the correct legal standards to answer that question. The trial court's final judgment and order should be affirmed.

## I.    Factual Background

### A. The Racist Origins of N.C.G.S. § 13-1

Years before the original version of N.C.G.S. § 13-1 was adopted, the North Carolina Constitution expressly forbade all African Americans, whether free or enslaved, from voting. This wholesale prohibition came about in 1835. Prior to 1835,

the state constitution already prohibited slaves from voting. But in response to African Americans' growing political influence in certain parts of the state and broader fears surrounding racial empowerment, there were calls to amend the state constitution to deny the franchise to all African Americans, regardless of their status as slaves or free people. This fear is encapsulated by a plea from white North Carolinians to the state legislature, urging the General Assembly to deny the franchise to free African Americans:

> A very large portion of our population are slaves, and recent occurrences must deeply impress . . . the vital necessity of keeping them in a state of discipline and subordination. . . . [P]ermitting free negroes to vote at elections, contributes to excite and cherish a spirit of discontent and disorder among the slaves. . . . Will not practices such as these . . . 'naturally excite in the salves discontent with their condition, encourage idleness and disobedience, and lead possibly in the course of human events, to the most calamitous of all contests, *a bellum servile* a servile war.'

The Sentinel (New Bern, N.C.), December 7, 1831, at 3. This plea further decried that *free* African Americans were not truly free: "[T]hey are forbidden to contract marriage except with their own class . . . [and] they are not called upon to aid in the execution of the civil or criminal processes of the law: they may be subjected even to the punishment of death on the testimony of a slave. Can these disabilities belong to the Freeman?" *Id.*

Concerns like these prevailed during the 1835 Constitutional Convention.[2] And so, in 1835, the North Carolina constitution was amended to provide that "[n]o free negro, free mulatto, or free person of mixed blood, descended from negro ancestors to the fourth generation inclusive[ ] (though one ancestor of each generation may have been a white person[ ]) shall vote for members of the Senate or House of Commons." N.C. Const. of 1776, amend. 1835, art. I, § 3(3) (1835). The constitution of 1835 did not contain a felony disenfranchisement provision. *See generally* N.C. Const. of 1776, amends. of 1835. Instead, the constitution prohibited individuals convicted of "infamous" crimes, such as treason, bribery, or perjury, from voting. N.C. Const. of 1776, amends. of 1835, art. I, § 4, pt. 4. Receiving an infamous punishment, such as a whipping, also served to bar individuals from voting.

The 1835 constitutional amendments were in effect for just over thirty years. Following the Civil War, however, North Carolina adopted a new constitution during the 1868 Reconstruction Convention as a condition for its return to the Union. The 1868 constitution provided for universal male suffrage, eliminated property ownership requirements as a condition for voting, and abolished slavery. Notably, the 1868 constitution did not contain any provision that denied the franchise to felons. *See generally* N.C. Const. of 1868.

---

[2] For example, Jesse Wilson of Perquimans County argued that "[c]olor is a barrier" and "[i]f you make it your business to elevate the condition of the blacks, in the same proportion do you degrade that of the poorer whites," which could lead to "an *increase of mixed breeds*." *State Convention*, The Weekly Standard (Raleigh, N.C.), June 19, 1835, at 2.

The 1868 constitution's promise of equal treatment for African Americans sparked an immediate and viscous backlash. Violence against African Americans and their sympathizers was rampant, as were efforts to prevent African Americans from voting. As part of these disenfranchisement efforts, "White former Confederates in North Carolina conducted an extensive campaign of convicting African American men of petty crimes *en masse* and whipping them to disenfranchise them 'in advance' of the Fifteenth Amendment," which was not ratified until 1870. The whipping campaign exploited a North Carolina law that disenfranchised anyone subject to this brutal and degrading form of punishment. One Congressman explained before the United States House of Representatives that "in North Carolina . . . they are now whipping negroes for a thousand and one trivial offenses . . . and in one county . . . they had whipped every adult male negro" in order to "prevent[ ] these negroes from voting."

White conservative Democrats ultimately regained control over the General Assembly in 1870 and doubled-down on efforts to suppress African Americans' newly won freedom. These efforts culminated in 1875 when a series of constitutional amendments were introduced that were intended to curb the rights of African Americans. For example, the amendments, which were ratified in 1876, banned interracial marriage, required segregation in public schools, and stripped counties of their ability to elect their own local officials, delegating that power instead to the

General Assembly.[3] N.C. Const. of 1868, amends. of 1875, amends. XXVI, XXV, XXX.

Particularly significant to this case, the 1876 amendments disenfranchised any person "adjudged guilty of felony" and provided that disenfranchised persons would be "restored to the rights of citizenship in a mode prescribed by law." N.C. Const. of 1868, amends. of 1875, amend. XXIV. The felon disenfranchisement amendment was introduced in the General Assembly by a former Confederate who had been "instructed by his nominating county to lead a 'crusade' against the 'radical civil rights officers' holders party,' *i.e.*, the party that supported equal rights for African American people[,]" as the trial court explained.

The trial court recognized that the General Assembly's disenfranchisement scheme "capitalized on Black Codes that North Carolina had enacted in 1866, which allowed sheriffs to charge African American people with crimes at their discretion," enabling targeted and systematic disenfranchisement. The amendment's purpose was no secret. As one conservative Democrat explained, felon disenfranchisement would result in "a purification of the ballot box." *Address of the Executive Democratic Central Committee to the People of North Carolina*, The Raleigh News (Raleigh, N.C.), June 23, 1875. This amendment remains on the books today, and it is largely unchanged since its ratification in 1876. *See* N.C. Const. art. VI, § 2(3).

During the first legislative session after the 1876 amendments were ratified,

---

[3] According to the trial court, "[t]he purpose of [the latter] amendment was to prevent African Americans from electing African American judges, or judges who were likely to support equality."

the General Assembly enacted a new law to implement the constitution's new felony disenfranchisement provision. The 1877 law prohibited people convicted of felonies from voting unless their rights were restored "in the manner prescribed by law." In turn, the "manner prescribed by law" incorporated an 1840s statute that governed rights restoration for individuals convicted of the most heinous crimes, namely treason and other "infamous crimes." In so doing, as the trial court stated, "[t]he 1877 statute took all of the onerous requirements for rights restoration that had previously applied only to people convicted of treason and for the first time extended them to anyone convicted of any felony."

Importantly, the 1877 law did not merely disenfranchise convicted felons during the duration of their prison sentences. Rather, the law continued to bar people from voting even after they were released from incarceration. An Act to Regulate Elections, ch. 275, §§ 10, 62, 1877 N.C. Sess. Laws 516, 519–20, 537. The law also imposed burdensome procedural requirements that convicted felons had to meet in order to have their rights restored. Namely, they had to wait four years from the date of their felony conviction to file a petition for rights restoration. *See* An Act Providing for Restoring to the Rights of Citizenship Persons Convicted of Infamous Crimes, ch. 36, § 3, 1841 N.C. Sess. Laws 68, 68. Once eligible to file a petition, they had to secure the testimony of "five respectable witnesses who have been acquainted with the petitioner's character for three years next preceding the filing of the petition, that his character for truth and honesty during that time has been good." *Id.* § 1. The witness

requirement served to bar people from petitioning for rights restoration until three years after their release from prison. Once a petition was filed, judges had complete discretion to approve or deny it, and the clerk of court was required to post the individual's petition on the courthouse door for a three-month period before the restoration hearing. *Id.* Any member of the public could then challenge the petition. *Id.*

The law's message was simple: once a felon, always a felon. Once an individual bore this label, only that person's extensive efforts coupled with the lucky draw of a sympathetic judge could restore the rights every other citizen enjoyed. But such luck could be difficult to come by. Indeed, according to the trial court, "[t]he 1877 law's adoption of the requirement to petition an individual judge for restoration had a particularly discriminatory effect against African American people considering the contemporaneous 1876 constitutional amendment stripping African American communities of the ability to elect local judges."

Together, the 1876 constitutional amendments and the 1877 law were intended to "instill White supremacy and . . . disenfranchise African-American voters." Legislative Defendants themselves conceded that the historical evidence presented at trial "demonstrates a shameful history of our state's use of laws, and with regard to voting in particular, to suppress the African American population."

**B. N.C.G.S. § 13-1's Modern History**

Despite some minor changes, the 1877 law went largely unchanged from 1897

until 1970. Most notably here, it was recodified at N.C.G.S. § 13-1 during this period, where it remains in effect today. Then in the early 1970s, the General Assembly's only African American members sought to amend the law to eliminate its denial of the franchise to individuals who had completed their prison sentences.

These efforts were first rejected in 1971. That year, two African American members of the General Assembly proposed a bill that would remove N.C.G.S. § 13-1's denial of the franchise to convicted felons who had finished serving their period of incarceration. Despite the purpose behind their original proposal, the bill was amended in committee to require the completion of "any period of probation or parole" before an individual could retain the right to vote, among other modifications. And as if this deprivation of the right to vote was not sufficiently severe, as the trial court's order explained, N.C.G.S. § 13-1 was further amended to require "two years [to] have elapsed since release by the Department of Corrections, including probation or parole" before an individual could petition for rights restoration.

In 1973, the only three African American members of the General Assembly again attempted to reform N.C.G.S. § 13-1. As before, their efforts to amend the law to restore a convicted felon's right to vote upon completion of the individual's prison sentence were unsuccessful. They were, however, able to persuade their colleagues to do away with the 1971 amendment that required a two-year waiting period *after* an individual finished serving a period of probation or parole. An Act to Provide for the Automatic Restoration of Citizenship, ch. 251, § 1, 1973 N.C. Sess. Laws 237, 237–

38.

The trial court found that "[t]he record evidence is clear and irrefutable that the goal of these African American legislators . . . was to eliminate section 13-1's denial of the franchise to persons released from incarceration and living in the community, but . . . they were forced to compromise in light of opposition by their 167 White colleagues" and to accept other modifications to the law.

## C. N.C.G.S. § 13-1's Modern Discriminatory Effects

Extreme racial disparities in disenfranchisement between African Americans and White individuals convicted of felonies persist. In North Carolina, a staggering 56,516 people are denied the franchise due to probation, parole, or post-release supervision from a felony conviction in state or federal court. Of North Carolina's voting-age population, 21% are African Americans yet, critically, over 42% of those denied the franchise due to felony probation, parole, or post-release supervision from a state court conviction alone are African American. By contrast, White people represent 72% of North Carolina's voting-age population yet only constitute 52% of those who are similarly denied the franchise. African Americans in North Carolina are denied the franchise at a rate 2.76 times as high as the rate of White people with 1.24% of the African American voting-age population being denied the franchise, whereas only 0.45% of the White voting-age population is similarly disenfranchised. These statistics demonstrate the stark reality of N.C.G.S. § 13-1's disproportionate effect on African Americans.

Countless extreme racial disparities in voter disenfranchisement of persons on community supervision also exist at the county level. The rate of African American disenfranchisement due to felony probation, parole, or post-release supervision is considered "high" in seventy-seven counties. However, the rate of White disenfranchisement only considered "high" in ten counties. In North Carolina, the highest rate of White disenfranchisement in any county is 1.25% whereas rates of African American disenfranchisement are as high as 2% in nineteen counties, 3% in four counties, and over 5% in one county. This means that one out of every twenty African American adults in that county cannot vote due to felony probation, parole, or post-release supervision.

There is not a single county in the state where the White disenfranchisement rate is greater than the African American disenfranchisement rate. The African American disenfranchisement rate is at least four times greater than the White rate in twenty-four counties and at least five times greater than the White rate in eight counties.

These grave differences represent the extreme disparate impact that the state's denial of the franchise to people on felony probation, parole, or post-release supervision has on African Americans. As one of Plaintiffs' experts opined, "We find in every case that it works to the detriment of the African American population." Although the Legislative Defendants' expert claims that there is no racial disparity in voter disenfranchisement of people on community supervision because "100% of

felons of every race in North Carolina" are disenfranchised, the statistics tell a very different, grim story.[4]

## II.   Analysis

## A. Standing

I agree with the Court's conclusion that "plaintiff-felons have standing to bring their claims against defendants" as well as its reasoning in reaching its conclusion as to the traceability issue. I reject the deference the Court affords Defendants' arguments, however, as they are entirely divorced from this Court's standing doctrine. They are so dumbfounding that they do not even warrant being acknowledged as "plausible." I therefore address these arguments separately. Though I also agree that Plaintiffs' injuries are redressable, I reach this conclusion on different grounds. Finally, I dissent from the majority's holding that plaintiff-organizations Community Success Initiative, Justice Served N.C., Inc., and Wash Away Unemployment lack standing in this litigation.

### 1. Traceability

Defendants argue that the Plaintiffs lack standing to challenge N.C.G.S. § 13-1 because "Plaintiffs have not been injured by Section 13-1. Rather, they have targeted the very avenue by which they may *regain* their right to vote." Instead,

---

[4] In its September 2020 summary judgment order, the trial court concluded that this expert's report was entitled to "no weight" because it was "unpersuasive in rebutting the testimony of Plaintiffs' experts, was flawed in some of its analysis and, while [he] is an expert in the broad field of political science, his experience and expertise in the particular issues before this panel are lacking."

Defendants argue that article VI, section 2(3) is responsible for depriving individuals on community supervision of the right to vote. In Defendants' view then, Plaintiffs have challenged the wrong law, and therefore the alleged injury is not traceable to the statute that is the subject of this litigation.

This argument fails because, as Plaintiffs point out, N.C.G.S. "§ 13-1 is the law that prevents people from registering to vote as long as they are on felony probation, parole, or post-release supervision." "As a general matter, the North Carolina Constitution confers standing on those who suffer harm . . . ." *Magnum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642 (2008) (citing N.C. Const. art. I, § 18). In other words, Plaintiffs are "required to demonstrate that [they have] sustained a legal or factual injury arising from defendants' actions." *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 629 (2022). Here, Plaintiffs do not challenge article VI's felon disenfranchisement provision itself. Rather, they challenge N.C.G.S. § 13-1's specific extension of article VI to individuals who have completed their prison sentences and have been released into their communities on probation, parole, or post-release supervision.

It is a first principle of constitutional interpretation that constitutional provisions "cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution." *Stephenson v. Bartlett*, 355 N.C. 354, 376 (2002). This means that article VI, section 2's denial of the franchise to anyone "adjudged guilty of a felony against this State or the United States, or adjudged guilty

of a felony in another state" cannot be read in such a way that would violate other provisions of the North Carolina constitution. *See* N.C. Const. art. VI, § 2(3). Thus, if Plaintiffs are correct that it violates other constitutional provisions to deny the franchise to individuals who have been released back into the community, article VI, section 2's disenfranchisement provision must necessarily be read to exclude those individuals. And if article VI, section 2(3) does not include individuals on probation, parole, or post-release supervision, then N.C.G.S. § 13-1 is singularly responsible for bringing those individuals within the reach of the constitution's disenfranchisement provisions.

But at this stage, the conclusion that Plaintiffs have standing does not turn on agreeing with their argument on the merits that N.C.G.S. § 13-1, rather than the North Carolina constitution, is responsible for disenfranchising the population of convicted felons that have reintegrated into the community. Defendants' argument that Plaintiffs lack standing is simply a misapplication of well-established standing doctrine.

Traceability is the requirement that an alleged "injury was likely caused by the defendant" in a case. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). In other words, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' " *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)

(alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 41–42 (1976)). In Defendants' view, there is no connection between the alleged injury—the disenfranchisement of individuals on community supervision in violation of multiple constitutional provisions—and Defendants' actions—the passage and continued implementation of N.C.G.S. § 13-1—because the constitution, rather than N.C.G.S. § 13-1, is responsible for Plaintiffs' injury.

In effect, Defendants' argument that Plaintiffs' injury is not traceable to the challenged law is based on the resolution of one of the primary issues that this Court must address on the merits—whether various provisions of the North Carolina constitution, namely the equal protection clause, the free elections clause, and the constitution's ban on property qualifications, require that convicted felons who have completed their prison sentences and have returned to their communities be permitted to vote. But whether Plaintiffs have standing to bring suit is a " 'threshold question' to be resolved before turning attention to more 'substantive' issues." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 490 (1982) (Brenan, J., dissenting). Indeed, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Here, however, Defendants argue that this Court should hold that Plaintiffs lack standing *by deciding* the merits of this dispute. The error lies in the wholesale integration of these two distinct analyses.

What is more, "[w]hile federal standing doctrine can be instructive as to general principles . . . and for comparative analysis, the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine." *Goldston v. State*, 361 N.C. 26, 35 (2006). In North Carolina, "[w]hen a person *alleges* the infringement of a legal right directly under a cause of action at common law, a statute, or the North Carolina Constitution, . . . the legal injury itself gives rise to standing." *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 609 (2021) (emphasis added). Here, Plaintiffs have alleged that they have been deprived of a legal right under N.C.G.S. § 13-1, and they have therefore established standing under North Carolina law. Even if one disagrees about whether there has, in fact, been a deprivation of any legal right, at this point in the analysis, Plaintiffs allegations are sufficient to establish their legal standing.

### 2. Redressability

Defendants also argue that Plaintiffs lack standing because their injury cannot be redressed by a favorable decision. This is perhaps an even more egregious misapplication of standing doctrine than Defendants' clumsy attempt to apply the federal traceability requirement. Redressability is the idea that, for a plaintiff to have standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561. Here, it is not merely likely but certain that a decision favorable to Plaintiffs, which holds that N.C.G.S. § 13-1 violates the North Carolina constitution, would redress the alleged injury.

If such a favorable decision were rendered, two conclusions would necessarily follow. First, Defendants' argument that article VI, section 2(3) itself disenfranchises individuals on probation, parole, or post-release supervision would fail based on the principle previously explained: that one constitutional provision "cannot be applied . . . in a manner that fails to comport with other requirements of the State Constitution." *Stephenson*, 355 N.C. at 376. Second, once it has been determined that the constitution prohibits the disenfranchisement of individuals on probation, parole, or post-release supervision, a court can redress the injury by striking the portions of N.C.G.S. § 13-1 that discriminate against this class of people. This is precisely what the trial court's injunction did here.

Perhaps aware of this straightforward redressability analysis, Defendants argue that such a remedy is not within the power of the courts. Specifically, Defendants contend that the trial court's injunction directing that "if a person otherwise eligible to vote is not in jail or prison for a felony conviction, they may lawfully register and vote in North Carolina" was an "attempt[ ] to prescribe the manner for felon re-enfranchisement itself," and thus the "Superior Court improperly exercised the lawmaking power reserved for the General Assembly."

The idea that the trial court "re[wrote] Section 13-1 [to] make new law to restore voting rights upon 'release from prison' rather than 'unconditional discharge' from a criminal sentence" is a dishonest mischaracterization of the trial court's injunction. As explained, after concluding that the equal protection clause, the free

elections clause, and the constitution's ban on property qualifications prohibit the General Assembly from discriminating against individuals on probation, parole, or post-release supervision, the trial court struck down the specific language in N.C.G.S. § 13-1 that denies the franchise to this class of individuals and imposed an injunction instructing that such individuals be permitted to register and vote.

Defendants do not cite a *single* cas*e* that supports the proposition that the trial court here lacked the authority to strike down N.C.G.S. § 13-1's discriminatory provisions and issue an injunction directing that individuals on probation, parole, or post-release supervision not be denied their constitutional right to vote. Nor could they. The trial court here did no more than "enjoin only the unconstitutional applications of [§ 13-1] while leaving other applications in force," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)—a routine action that courts must take when faced with an unconstitutional statute. "Each time a court strikes down a statutory provision, it must determine whether to invalidate only the unconstitutional provision or instead whether to invalidate the statute in its entirety or in substantial part." Kenneth A. Klukowski, *Severability Doctrine: How Much of a Statute Should Federal Courts Invalidate?*, 16 Tex. Rev. L. & Pol. 1, 3 (2011). Indeed, "[f]ew would suggest that a court should invalidate an entire statute every time any aspect of the statute is unconstitutional." *Id.* at 7; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("[T]he 'normal rule' is 'that partial,

rather than facial, invalidation is the required course.' " (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985))).

This Court has *never* suggested that North Carolina's courts lack such authority. In fact, this Court has done just the opposite and has conducted severability analyses in countless cases virtually since its inception. *See, e.g. Pope v. Easley*, 354 N.C. 544, 548 (2001) (determining "whether the trial court properly severed the unconstitutional part of" a statute); *Appeal of Springmoor, Inc.*, 348 N.C. 1, 13 (1998) ("[S]everance may be applied to save the remainder of a statute if it is apparent that the legislative body, had it known of the invalidity of the one portion, would have enacted the remainder alone." (cleaned up)); *State v. Waddell*, 282 N.C. 431, 442 (1973) ("If the objectionable parts of a statute are severable from the rest . . . the statute may be enforced as to those portions of it which are constitutional." (cleaned up)), *superseded on other grounds by statute*; An Act to Amend G.S. 14-17 Murder Defined and Punishment Provided for Murder, Rape, Burglary and Arson, ch. 1201, § 1, 1973 N.C. Sess. Laws 323, 323; *Keith v. Lockhart*, 171 N.C. 451 (1916) ("It is the recognized principle that . . . [w]here a part of the statute is unconstitutional, but the remainder is valid, the parts will be separated, if possible, and that which is constitutional will be sustained." (cleaned up)); *Gamble v. McCrady*, 75 N.C. 509, 512 (1876) ("[W]hile the general provisions of an act may be unconstitutional, one or more clauses may be good, provided they can be separated from the others so as not to depend upon the existence of the others for their own.").

There is simply nothing unique or unusual about the trial court's injunction here, and it is certainly not a basis from which to conclude that Plaintiffs lack standing in this case.

### 3. *Organizational Standing*

The majority relies on *River Birch Associates v. City of Raleigh,* 326 N.C. 100 (1990), for the proposition that two of the Organizational Plaintiffs do not have standing because they have failed to allege their own injuries with sufficient particularity and failed to allege that they have members who are injured by the statute they challenge.[5] *River Birch Associates* relied on two federal cases decided in the 1970s, *Warth,* 442 U.S. 490 (1979), and *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333 (1977). *River Birch Assocs.*, 326 N.C. at 129–30. None of these cases consider this Court's careful analysis of the distinction between standing in federal court and standing in state court as elaborated in *Committee to Elect Dan Forest,* 376 N.C. 558. Moreover, the majority relies solely on allegations in the complaint rather than examining all the evidence produced at the trial, which potentially also bears on organizational standing at this stage of the proceedings.

Since none of the parties made the argument now relied upon by the majority,

---

[5] The majority also concluded that similar resource allocation allegations were insufficient to establish the North Carolina State Conference of the NAACP's standing. However, the Court held that this Organizational Plaintiff established standing through additional allegations in the amended complaint.

it is unwise to undergo the superficial standing analysis advanced here. Claiming that assertions in the complaint regarding resource allocation are too vague without acknowledging the fuller testimony in the record from Plaintiff Organizations is unfair to plaintiffs. In light of the relaxed "injury in fact" requirement established by this Court only two years ago in *Committee to Elect Dan Forest* and the fuller testimony in the record regarding the activities and efforts of the Organizational Plaintiffs that the majority summarily concludes do not have standing, that conclusion is in error.

## III.    N.C.G.S. § 13-1 Violates Multiple Provisions of the North Carolina Constitution

### A. The Equal Protection Clause

Plaintiffs allege and the trial court concluded that N.C.G.S. § 13-1 violates the equal protection clause based on three distinct grounds: (1) that the statute unconstitutionally discriminates based on race; (2) that it deprives African Americans of the fundamental right to vote on equal terms; and (3) that it imposes an unconstitutional wealth-based classification. The majority does not dispute much of the evidence that the trial court relied on in finding these constitutional violations. But in spite of the extensive evidence upon which the trial court's findings and conclusions are based, the majority nonetheless determines that N.C.G.S. § 13-1 does not violate the equal protection clause in any respect. This conclusion can follow only from a complete disregard of the evidence before this Court.

### 1.   *Discrimination Based on Race*

The trial court held that N.C.G.S. § 13-1's denial of the franchise to people on felony supervision violates the equal protection clause because it discriminates against African Americans in intent and effect. The majority holds otherwise, reasoning that "[t]he trial court misapplied the *Arlington Heights* factors and relied on manifestly insufficient evidence to bolster its conclusion that racial discrimination prompted the General Assembly . . . not to restore the citizenship rights of persons on felony supervision." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977). Considering the ample evidence of racial discrimination Plaintiffs have produced and the trial court accepted, the majority demonstrates that it would prefer to simply pretend racial discrimination does not exist today, rather than grapple with the plain and undisputed facts in front of it.

*a. Analyzing Facially Neutral, Discriminatory Laws*

Though the parties do not dispute that *Arlington Heights* controls here, the majority finds it necessary to point out that this Court is "free to depart from the federal burden-shifting framework" imposed by *Arlington Heights* "if [the Court] deem[s] it incompatible with the principles that guide our review of state constitutional challenges."

True enough. If this Court believed it appropriate, it could indeed apply a framework of its own design to determine whether a facially neutral law discriminates based on race in violation of the equal protection clause. What the majority fails to mention, however, is that any test it fashions must render the state

constitution's equal protection clause at least as potent as its federal counterpart. *See State v. Carter*, 322 N.C. 709, 713 (1988) ("Even were the two provisions identical, we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision."); *see also Stephenson v. Bartlett*, 355 N.C. 354, 381 n.6 (2002). Unsurprisingly then, and despite its musings about its authority to apply a framework other than *Arlington Heights*, the majority proceeds with the *Arlington Heights* analysis.[6]

### b. The Trial Court's Findings of Fact are Binding

Before the majority analyzes N.C.G.S. § 13-1 under the *Arlington Heights* framework, it first criticizes the trial court's final judgment and order for omitting a direct reference to "the presumption of legislative good faith." The majority therefore concludes that "[i]nasmuch as the trial court did not presume legislative good faith, its findings of fact concerning the discriminatory intent allegedly infecting section 13-1 are not binding on appeal." For one thing, the presumption of legislative good faith

---

[6] This Court has, in fact, applied *Arlington Heights* to a facially neutral law before. *See Holmes v. Moore*, 383 N.C. 171 (2022), *rev'd*, No. 342PA19-3 (N.C. Apr. 28, 2023). Today, the majority overturns this decision in a separate opinion, expressing the same inexplicable resistance to applying the *Arlington Heights* framework. *See Holmes*, slip op. at 22. In repeatedly challenging the applicability of *Arlington Heights* but applying its framework anyway, as here, or adopting an inadequate framework as in the newly issued *Holmes* opinion, it appears that the Court's current majority is merely reluctant to accept that facially neutral laws can be found to be discriminatory. The Court seems poised to make this endeavor more challenging. Unfortunately for the majority, the federal Constitution will constrain these efforts.

is built into the *Arlington Heights* framework when properly applied in that plaintiffs must first present evidence of the discriminatory intent behind a legislative act. But "[w]hen there is . . . proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265–66.

In holding that the trial court did not clearly apply the presumption of good faith, the majority perhaps attempts to follow the reasoning of federal circuit court cases that have concluded that the trial court failed to apply the presumption. *See, e.g.*, *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022). But cases in the federal circuit courts of appeals that have held that the trial court rulings at issue failed to apply the presumption of good faith examine the content of the trial courts' *Arlington Heights* analyses themselves, rather than admonish the trial courts for failing to declare that the presumption of good faith has been applied. *See, e.g., League of Women Voters of Fla.*, 32 F.4th at 1373 ("[W]hile we do not require courts to incant magic words, it does not appear to us that the district court here meaningfully accounted for the presumption at all.").

The trial court need not explicitly state that it has applied the presumption, as the majority suggests. The presumption is better assessed by reference to the trial court's actual analysis of racial discrimination than by simplistically noting whether it used certain magic words, and the majority need not agree with this analysis to

understand that the presumption has been applied. Here, and analyzed in depth below, the trial court considered in exhaustive detail Plaintiffs' evidence of racial discrimination under N.C.G.S. § 13-1. After concluding that Plaintiffs introduced ample evidence of discriminatory intent, the trial court properly shifted the burden to Defendants to prove race-neutral justifications. Ignoring the trial court's painstaking analysis, the majority forsakes a thoughtful review of the trial court's decision for expediency—in the majority's view, the trial court did not directly mention the presumption of good faith, so it must not haven been applied.

Moreover, though a trial court's failure to apply the presumption of good faith may impact its conclusions of law, a trial court's findings of fact are based on concrete facts contained in the record. Put another way, a failure to apply the presumption of good faith does not change the veracity of the facts themselves—only the conclusions drawn from them. As much as the majority may like to resist the trial court's findings, as they reveal the malicious and racist intent of N.C.G.S. § 13-1, a fact is a fact. And in this case, Defendants contested almost none of the trial court's factual findings. The presumption of good faith is not a magic wand that transforms such uncontested facts into mere ruminations that this Court, as an appellate court, can accept or reject at will without a specific legal basis for doing so. But that is how the majority treats the presumption—without mentioning a *single* finding of fact that demonstrates that the trial court failed to apply the presumption of good faith, the majority inexplicably declares *all* of them nonbinding. This it cannot do.

c. *Discriminatory Impact*

As to N.C.G.S. § 13-1's discriminatory impact, the majority holds that "[t]he trial court's findings of fact do not support its ultimate finding that section 13-1 has a disproportionate impact on African Americans." This conclusion is plainly incorrect.

The trial court made extensive findings based on evidence introduced by Plaintiffs that N.C.G.S. § 13-1 has a discriminatory impact. Its findings include:

- That African Americans represent 21% of the voting-age population in North Carolina, but 42% of the people who are denied the franchise under N.C.G.S. § 13-1 from a North Carolina state court conviction alone. African American men make up 9.2% of the total voting-age population but constitute 36.6% of the people who are disenfranchised by N.C.G.S. § 13-1. By contrast, White people make up a much larger share of North Carolina's voting-age population—72%, to be precise— but only constitute 52% of those denied the franchise under N.C.G.S. § 13-1.

- That 1.24% of the total African American voting-age population in North Carolina is on community supervision compared to 0.45% of the total White voting-age population. African Americans are therefore disenfranchised at a rate that is 2.76 times as high as White people.

- That the number of African Americans on community supervision that are denied the franchise under N.C.G.S. § 13-1 relative to the overall

number of African American registered voters is almost three times as high as the number of White people on community supervision that are denied the franchise under N.C.G.S. § 13-1.

- That African Americans are disenfranchised under N.C.G.S. § 13-1 at higher rates that White people in the eighty-four counties that have sufficient data to perform comparative analyses. There is not a single county where the White disenfranchisement rate is greater than the African American disenfranchisement rate.

- That in seventy-seven of those counties, the rate of African American disenfranchisement is high (over 0.83% of the African American voting-age population), whereas the rate of White disenfranchisement is high in only ten counties.

- That in forty-four counties, the percentage of the African American voting-age population that is denied the franchise under N.C.G.S. § 13-1 is at least three times greater than the comparable percentage of the White population. In twenty-four counties, the African American disenfranchisement rate is at least four times greater than the White disenfranchisement rate. In eight counties, the African American disenfranchisement rate is at least five times greater than the White disenfranchisement rate.

This non-exhaustive list covers only a few of the trial court's findings regarding N.C.G.S. § 13-1's discriminatory impact. Based on this extensive statewide and county-level data, the trial court found that "North Carolina's denial of the franchise [to individuals] on felony probation, parole, or post-release supervision disproportionately affects African Americans by wide margins." Importantly, the trial court found that "[a]lthough more White people are denied the franchise due to felony post-release supervision than African American people in [the] aggregate, this does not affect the finding that African American people are disproportionately affected by section 13-1." In North Carolina, there are nearly 6 million White voting-age individuals compared to fewer than 1.8 million African American voting-age individuals. Thus, the trial court found that "to determine whether racial disparities exist, it is necessary to compare African American and White rates of disenfranchisement, rather than aggregate numbers of disenfranchised African American and White people."

Notably, the majority does not hold that these findings are erroneous. Instead, it reasons only that the fact that "African Americans make up about forty-two percent of the felon population seems to account for the disproportionate share . . . of African Americans on felony supervision." But this reasoning ignores a core reality of this case—N.C.G.S. § 13-1 was designed to prohibit as many African Americans from voting as possible by preying on the disproportionate makeup of the felon population.

The issue the majority raises simply demonstrates that N.C.G.S. § 13-1 is working precisely as it was intended.

Take a moment to consider the import of the majority's logic. If this argument were correct, then any disparate impact analysis would be meaningless—it would be impossible to prove that *any* facially-neutral, discriminatory law designed to exploit a societal inequality causes a disparate impact. Using the majority's logic, poll taxes would not have a discriminatory impact because at the time the poll tax was held to be unconstitutional, African Americans were disproportionately poor, meaning wealth inequality, rather than laws implementing poll taxes, was to blame for the disproportionate number of African Americans barred from voting. Likewise, literacy tests would not have a discriminatory impact because, applying the majority's rationale, "the fact that African Americans [made up a disproportionate share of those who were illiterate would] seem[ ] to account for the disproportionate share . . . of African Americans" who were barred from voting because they could not pass literacy tests.[7] It is no wonder Defendants themselves did not even raise this point as a basis for concluding that there is no evidence that N.C.G.S. § 13-1 has a disparate impact. The majority's fundamentally flawed logic is no basis for concluding that, in

---

[7] It is well understood that literacy tests were "particularly effective" at suppressing African American voters. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 219–20 (2009). "These laws were based on the fact that as of 1890," in many southern states, including North Carolina, "more than two-thirds of the adult Negroes were illiterate while less than one-quarter of the adult whites were unable to read or write." *South Carolina v. Katzenbach*, 383 U.S. 301, 311 (1966).

spite of the overwhelming evidence, "[t]he trial court's findings of fact do not support its ultimate finding that section 13-1 has a disproportionate impact on African Americans."[8]

### d. *Historical Background*

The historical background of N.C.G.S. § 13-1 also supports that the law was motivated by discriminatory intent. Importantly, as noted by the trial court, "[i]t was well understood and plainly known in the 1970s that the historical and original motivation for denial of the franchise to persons on community supervision in the post-reconstruction era had been to attack and curb the political rights of African Americans." At no time during this litigation have Legislative Defendants disputed that the General Assembly was aware of this fact at the time that N.C.G.S. § 13-1 was amended both in 1971 and 1973. Despite its knowledge of the racist history and lasting discriminatory impact of N.C.G.S. § 13-1's denial of the franchise to individuals on community supervision, the General Assembly maintained this provision when amending N.C.G.S. § 13-1 in 1971 and 1973. During trial, Legislative Defendants did not offer *any* race-neutral explanation for this decision. Meanwhile, Defendants "presented no evidence at any time during trial advancing any race-

---

[8] The majority attempts to salvage its conclusion and asserts that the dissent misunderstands its position. The majority explains "the trial court should have compared the percentages of African American felons and white felons ineligible for re-enfranchisment under section 13-1 with the racial makeup of the total felon population because, unlike the poll tax that all would-be voters had to pay, section 13-1's scope is limited to individuals with felon convictions." This explanation is nonsensical, but it appears to merely rephrase the reasoning already described. It fails for the same reasons.

neutral explanation for the legislature's decision in 1971 and 1973 to preserve, rather than eliminate, the 1877 bill's denial of the franchise to persons on community supervision."

Further, at the time that N.C.G.S. § 13-1 was amended in the 1970s, the General Assembly was plagued by racism among its members. In 1973, there were only three African American members of the General Assembly compared to 167 White representatives.[9] Many of these White representatives held openly racist views about African Americans and used racial slurs to refer to the General Assembly's three African American members. This evidence demonstrates the tenor of the General Assembly at the time that it chose to retain N.C.G.S. § 13-1's community supervision disenfranchisement provision despite being aware of the law's intended and continued impact on African American voters.

At this point in the analysis, it is important to remember that *Arlington Heights* "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." 429 U.S. at 265. This means that we do not have to decide how important the racist motivations were behind the General Assembly's decision to continue disenfranchising individuals on community supervision because "racial

---

[9] In 1971, there were only two African American legislators in the General Assembly.

discrimination is not just another competing consideration." *Id.* Any degree of a racially-fueled motivation is too much. Based on the evidence before it, the trial court correctly concluded that race was at least one of the motivating factors in the General Assembly's decision to retain N.C.G.S. § 13-1's disenfranchisement provision for individuals on community supervision and shifted to burden to the Defendants to offer a race-neutral explanation for the decision to retain the provision. As noted, Defendants did not provide any such evidence.[10]

Though it is true that the intentions of the General Assembly in the 1970s ultimately determine whether N.C.G.S. § 13-1 was motivated by discriminatory intent, as the majority recognizes, the law's pre-1971 history is not irrelevant to this analysis. Indeed, this history provides important context for understanding the changes that came about in the 1970s. The United States Supreme Court has similarly held that even when a law undergoes changes over time, its history remains relevant.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), the United States Supreme Court held that a felon disenfranchisement provision in the Alabama constitution constituted an equal protection violation under the Fourteenth Amendment. There,

---

[10] In applying the *Arlington Heights* framework in this manner, the trial court gave Defendants all of the legislative good faith they were due: It placed the burden on Plaintiffs to present convincing evidence of racial discrimination and gave Defendants an opportunity to provide race-neutral explanations for the General Assembly's decisions. When Defendants failed to provide such explanations, there was simply no more deference that could be afforded.

despite acknowledging the racist history of the constitutional provision, the defendants argued that this history was inapposite because subsequent changes to the law's enforcement, including court decisions striking down various portions of the provision, rendered what remained constitutional. *Id.* at 232–33.

The United States Supreme Court rejected this argument, explaining that regardless of whether the provision would be constitutional had it been passed with race-neutral motivations and in its current form today, "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." *Id.* at 233. The same is true here: Section 13-1 was passed with racist motivations, it was amended with full knowledge of both those motivations and its discriminatory impact, members of the General Assembly themselves engaged in racist behavior at the time N.C.G.S. § 13-1 was amended, and no alternative reason for retaining the discriminatory provision of N.C.G.S. § 13-1 that Plaintiffs challenge has been provided. Though there may be instances "where a legislature actually confronts a law's tawdry past in reenacting it [and] the new law may well be free of discriminatory taint[, t]hat cannot be said of" N.C.G.S. § 13-1. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring).[11]

---

[11] The majority rejects *Hunter* as inapplicable here because the General Assembly "repealed allegedly discriminatory laws and replaced them with a substantially different statutory scheme." But this argument ignores that the specific provision in N.C.G.S. § 13-1 that is challenged here originates in the version of the law that was passed in 1877. Any amendments in the 1970s that altered the statutory scheme or made it easier for felons to have their rights restored do not bear on the unchanged challenged provision.

The majority disagrees that N.C.G.S. § 13-1's historical background demonstrates its discriminatory intent. The majority explains that "[w]hile it would be an overstatement to say that the trial court should have ignored [N.C.G.S. § 13-1's] pre-1971 history recounted in its order, plaintiffs' claims must finally rise or fall on whether their evidence overcomes the presumption of legislative good faith and proves that discriminatory intent" motivated N.C.G.S. § 13-1 as amended in the 1970s. The majority notes that the trial court should have considered "the legislature's approval in 1969 of what became our current state constitution" because "that document incorporated equal protection and nondiscrimination guarantees that had not appeared in our previous state constitutions." Confusingly, however, the majority's analysis ends there. It does not actually analyze the evidence presented surrounding N.C.G.S. § 13-1's post-1971 history.

### e.   *Legislative Process and History*

Section 13-1's relevant legislative process and history is somewhat limited because the General Assembly did not explicitly declare its reasons for retaining the disenfranchisement provision at issue. Though N.C.G.S. § 13-1's legislative history is not enough on its own to prove racially discriminatory intent, it adds further support to the trial court's conclusion that the decision was motivated by such intent.

The trial court made several important findings with respect to N.C.G.S. § 13-1's amendments in the 1970s. Specifically, in 1971, the only two African American members of the General Assembly proposed a bill that would, among other changes,

" 'automatically' restore citizenship rights to anyone convicted of a felony 'upon the full completion of his sentence.' " The proposal was rejected and the bill was "amended to retain N.C.G.S. § 13-1's denial of the franchise to people living in North Carolina's communities." The bill was further amended to both add an oath requirement and mandate that a felon wait two years after completion of all terms of a sentence before rights could be restored. The 1971 version of N.C.G.S. § 13-1 passed as amended. At the time, one of the African American legislators who introduced the original version of the bill—Representative Henry Frye—explained on the floor of the North Carolina House of Representatives that "he preferred the bill's original provisions which called for automatic restoration of citizenship when a felon had finished his prison sentence, but he would go along with the amendment if necessary to get the bill passed."

In 1973, the General Assembly's three African American members again attempted to reform N.C.G.S. § 13-1. Though they were successful in convincing their fellow members to eliminate the oath requirement and the two-year waiting period from the 1971 amendments, "they were not able to reinstate voting rights upon release from incarceration." Senator Henry Michaux Jr., who was previously a member of the North Carolina House of Representatives and was one of the members who introduced the 1973 proposal, explained that the intention behind the 1973 proposal to amend N.C.G.S. § 13-1 "was a total reinstatement of rights, but [they] had to compromise to reinstate citizenship voting rights only after completion of a sentence of parole or probation."

Based on these facts, the trial court found that it "is clear and irrefutable that the goal of these African American legislators . . . was to eliminate section 13-1's denial of the franchise to persons released from incarceration and living in the community, but that they were forced to compromise in light of opposition by their 167 White colleagues to achieve other goals." As before, this legislative history is useful in contextualizing N.C.G.S. § 13-1's continued disenfranchisement of individuals on community supervision. To repeat, "[i]t was well understood and plainly known in the 1970s that the historical and original motivation for denial of the franchise to persons on community supervision in the post-reconstruction era had been to attack and curb the political rights of African Americans." Aware of N.C.G.S. § 13-1's history and its lasting effects, the predominantly White General Assembly chose to retain the challenged provision and in the process, rejected multiple attempts to eliminate it without having ever provided justifications for doing so.

### f. *Race-Neutral Motivations*

In light of the extensive evidence supporting that discriminatory intent was a motivating factor in passing N.C.G.S. § 13-1, the trial court correctly "shifted to [Legislative Defendants] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. Defendants utterly failed this task.

As the trial court found, "Defendants failed to introduce any evidence supporting a view that section 13-1's denial of the franchise to people on felony

supervision serves any valid state interest today." For example, the interrogatory responses for the State Board Defendants identified interests behind N.C.G.S. § 13-1, including "regulating, streamlining, and promoting voter registration and electoral participation among North Carolinians convicted of felonies who have been reformed"; "simplifying the administration of the process to restore the rights of citizenship to North Carolinians convicted of felonies who have served their sentences"; and "avoiding confusion among North Carolinians convicted of felonies as to when their rights are restored." However, "[t]he Executive Director testified that the State Board is not asserting that the denial of the franchise to people on felony supervision serves any of these interests as a factual matter in the present day, and she admitted that the State Board is unaware of any evidence that denying the franchise to such people advances any of these interests." Moreover, "the State Board's Executive Director conceded that *striking down* section 13-1's denial of the franchise to people on felony supervision would 'promote their voter registration and electoral participation.' "[12]

In this Court, Defendants argued that N.C.G.S. § 13-1's denial of the franchise to individuals on felony supervision is "easily administrable by the State and easily understood by the felons it impacts." They also argued that it advances the State's "interest in *restoring* felons to the electorate after justice has been done and they have

---

[12] Though the State Board Defendants are not a party to this appeal, these responses demonstrate the lack of a plausible explanation for N.C.G.S. § 13-1's retention of the community supervision disenfranchisement provision.

been fully rehabilitated by the criminal justice system," quoting *Jones v. Governor of Florida*, 975 F.3d 1016, 1034 (2020).

But Defendants provide no citation or explanation for why the current requirements of N.C.G.S. § 13-1 are "easily administrable." Presumably, amending N.C.G.S. § 13-1 to restore rights once an individual is released from jail or prison would be just as easy to administrate, if not more so. Similarly, such language would be easily understood by individuals who have been convicted of a felony. In the face of extensive evidence of N.C.G.S. § 13-1's discriminatory intent and effect, these proffered race-neutral justifications are little more than a weak attempt to mask N.C.G.S. § 13-1's nefarious purpose.

In sum, N.C.G.S. § 13-1's discriminatory impact is both statistically and practically significant, and its racist motivations are clear. Because "there is proof that a discriminatory purpose has been a motivating factor [behind § 13-1] . . . judicial deference [to the legislature] is no longer justified," *see Arlington Heights*, 429 U.S. at 265–66, and it became Defendants burden to provide race-neutral justifications for the law under *Arlington Heights*. Defendants failed at this task, and N.C.G.S. § 13-1 therefore discriminates based on race in violation of North Carolina's equal protection clause.

### 2. *The Fundamental Right to Vote on Equal Terms*

The right to vote on equal terms is a fundamental right. *Northampton Cnty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747 (1990). The right not only protects

an individual's ability to participate in the electoral process but also "the principles of substantially equal voting power and substantially equal legislative representation." *Stephenson v. Bartlett*, 355 N.C. 354, 382 (2002) When a law "impermissibly interferes with the exercise of a fundamental right," strict scrutiny applies. *Id.* at 377 (quoting *White v. Pate*, 308 N.C. 759, 766 (1983)).

The trial court correctly concluded that N.C.G.S. § 13-1's denial of the franchise to people on felony supervision violates their fundamental right to vote, as well as the right of all African Americans to vote with substantially equal voting power. "The right to vote is the right to participate in the decision[  ]making process of government" among all persons "sharing an identity with the broader humane, economic, ideological, and political concerns of the human body politic." *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 13 (1980). By denying individuals the right to vote until they have completed any period of felony supervision, N.C.G.S. § 13-1 denies individuals who have been released from prison the opportunity to engage in this civic process.

Yet again, with tautological insistence, the majority holds that N.C.G.S. § 13-1 violates neither the fundamental right to vote nor its inextricable promise of the right to vote on equal terms, reasoning that N.C.G.S. § 13-1 does not deprive individuals on felony supervision of the fundamental right to vote because "felons have no fundamental right to vote, as Article VI, Section 2(3) expressly divests them of this right upon conviction." Repeating this argument to the point of absurdity does

not make it stronger. Again, article VI, section 2(3)'s felon disenfranchisement provision does not enable N.C.G.S. § 13-1 to function as a blank check to the legislature to impose any "re-enfranchisement" requirements it desires.

An example demonstrates this point. No one would contend that, as a result of article VI, section 2(3)'s expansive language, N.C.G.S. § 13-1 could contain a provision that expressly prohibits only African American felons from voting until they have completed felony supervision, while individuals of any other race have their rights restored upon completion of their prison sentences. Such a provision, which is an example of an express, race-based classification, would violate other sections of the North Carolina constitution, namely the equal protection clause. In the same vein, article VI, section 2(3) is not a blanket permission to the General Assembly to use N.C.G.S. § 13-1 as a means of passing racially discriminatory restrictions that are race-neutral on their face.

N.C.G.S. § 13-1 denies individuals on community supervision of the right to vote in the most literal way possible: It forbids this class of people from voting. As previously explained, N.C.G.S. § 13-1 is unconstitutional on other grounds because, in singling out individuals on felony supervision, it discriminates against African Americans in violation of the equal protection clause's guarantee that no "person [shall] be subjected to discrimination by the State because of race," N.C. Const. art. I, § 19, and it is not justified by any compelling state interest. Because N.C.G.S. § 13-1's denial of the franchise to individuals on felony supervision unconstitutionally

discriminates on the basis of race, it follows that this provision illegitimately deprives this class of people of their fundamental right to vote.

The trial court also concluded that N.C.G.S. § 13-1 violates the equal protection clause because it "unconstitutionally denies [African Americans] substantially equal voting power on the basis of race." As explained above, the right to substantially equal voting power derives from the fundamental right to vote itself and was recognized by this Court in *Stephenson*, 355 N.C. at 379. There, the Court, applying strict scrutiny, held that "use of *both* single-member and multi-member districts within the same redistricting plan violates the Equal Protection Clause of the State Constitution unless it is established that inclusion of multi-member districts advances a compelling state interest." *Id.* at 380–81 (footnote omitted). The Court held that certain uses of multi-member districts could violate the state constitution's equal protection clause by depriving North Carolina voters of "the fundamental right . . . to substantially equal voting power." *Id.* at 379.

The majority does not address this issue, but Defendants contend that N.C.G.S. § 13-1 does not deprive African Americans of equal voting power because "convicted felons are not constitutionally entitled to vote *at all* until their voting rights are restored in a manner that the General Assembly provides." Aside from repeating the same point that this dissent has repeatedly rejected, this argument fails to recognize the full class of people who are denied the right to substantially equal voting power. This class is not limited to African Americans on felony

-112-

supervision as Defendants imply. Rather, N.C.G.S. § 13-1 denies substantially equal voting power to the entire African American electorate by disproportionately disenfranchising African American potential voters.

To repeat, at the statewide level, the rate of African American disenfranchisement under N.C.G.S. § 13-1 is 2.76 times as high as the comparable percentage of the White population that is disenfranchised. At the county level, the percentage of voting-age African Americans who are disenfranchised is at least three times as high as the disenfranchised White population in forty-four counties, four times as high in twenty-four counties, and five times as high in eight counties. In every single county where there is sufficient data to perform a comparison, voting-age African Americans are disenfranchised under N.C.G.S. § 13-1 at higher rates than White people. These numbers are glaring, and it stands to reason that a law that was motivated by the overtly discriminatory purpose of repressing the African American vote in an effort to stifle African American political power and that successfully achieves that intended effect denies the African American population of "substantially equal voting power by diminishing or diluting their votes on the basis of [race]." *Harper v. Hall*, 380 N.C. 317, 378–79 (2022), *cert. granted sub nom. Moore v. Harper*, 142 S. Ct. 2901 (2022), *vacated, Harper v. Hall*, No. 413PA21-2 (N.C. Apr. 28, 2023).

Under article I, section 19, strict scrutiny applies when: (1) a "classification impermissibly interferes with the exercise of a fundamental right"; or (2) a statute

"operates to the peculiar disadvantage of a suspect class." *Stephenson*, 355 N.C. at 377 (quoting *White v. Pate*, 308 N.C. 759, 766 (1983)). Thus, when the "fundamental right to vote on equal terms" is implicated, "strict scrutiny is the applicable standard." *Id.* at 378.

Section 13-1 cannot withstand this exacting review. "Under strict scrutiny, a challenged governmental action is unconstitutional if the State cannot establish that it is narrowly tailored to advance a compelling governmental interest." *Id.* at 377. To repeat the trial court's finding, "Defendants failed to introduce any evidence supporting a view that section 13-1's denial of the franchise to people on felony supervision serves any valid state interest today," let alone a compelling one. The interests that the state did attempt to assert were mere pretexts given their lack of logic and were certainly not narrowly tailored. In any case, there is very little in the way of a compelling government interest that could permit the legislature to deny an entire class of people the fundamental right to vote on otherwise unconstitutional grounds.

### 3. *Wealth-based Classification*

In concluding that N.C.G.S. § 13-1 imposes a wealth-based classification under the North Carolina constitution, the trial court explained that "by requiring an unconditional discharge that includes payments of all monetary obligations imposed by the court, N.C.G.S. § 13-1 creates a wealth classification that punishes felons who are genuinely unable to comply with the financial terms of their judgment more

harshly than those who are able to comply." Put simply, N.C.G.S. § 13-1 "provides that individuals, otherwise similarly situated, may have their punishment alleviated or extended solely based on wealth." The trial court applied strict scrutiny because "when a wealth classification is used to restrict the right to vote or in the administration of justice, it is subject to heightened scrutiny," rather than rational basis review. It further concluded that N.C.G.S. § 13-1 cannot not survive this exacting review.

In applying strict scrutiny, the trial court relied on the Supreme Court's decision in *M.L.B v. S.L.J.*, 519 U.S. 102 (1996), which applied heighted scrutiny to a termination of parental rights case. There, the Court "d[id] not question the general rule . . . that fee requirements ordinarily are examined only for rationality." *Id.* at 123. But it held that precedent "solidly establish[ed] two exceptions to that general rule." *Id.* at 124. "The basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license. Nor may access to judicial processes in cases criminal or 'quasi criminal in nature' turn on ability to pay."[13] *Id.* (cleaned up). The *M.L.B.* Court explained that these types of sanctions "are wholly contingent on one's ability to pay, and thus 'visi[t] different consequences on two categories of persons' they apply to all indigents and do not reach anyone outside

---

[13] The Court cited *Williams v. Illinois*, 399 U.S. 235 (1970), which struck down an Illinois law providing for the extended incarceration of an indigent offender who was unable to pay costs associated with his conviction. The Court explained that "the Illinois statute in operative effect exposes *only indigents* to the risk of imprisonment beyond the statutory maximum." *Id.* at 242.

that class." *Id.* at 127 (alteration in original) (citation omitted) (quoting *Williams v. Illinois*, 399 U.S. 235, 242 (1970)). *M.L.B.* extended certain prohibitions on fee requirements from the criminal context to cases involving termination of parental rights because "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 119 (alteration in original) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

*M.L.B.* in turn relied on *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966), the landmark United States Supreme Court case that struck down as unconstitutional any law making "the affluence of the voter or payment of any fee an electoral standard." *Id.* at 666. The United States Supreme Court reasoned that, while the States are free to regulate certain voter qualifications, these valid qualifications "have no relation to wealth nor to paying or not paying this or any other tax." *Id.*

The principles of *M.L.B.* and *Harper* apply here. By conditioning restoration of the right to vote on the payment of fees that are prohibitive to many, N.C.G.S. § 13-1 "exposes only indigents to the risk of" being unable to reclaim their fundamental right to vote. *Williams*, 399 U.S. at 242. As in *M.L.B.*, N.C.G.S. § 13-1 " 'visi[ts] different consequences on two categories of persons,' [it] appl[ies] to all indigents and do[es] not reach anyone outside that class." *M.L.B.*, 519 U.S. at 127. But it should not matter "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it." *Harper*, 383 U.S. at 668. And in the same way

that one's ability to pay a poll tax in order to vote is not a valid voter qualification, the ability to pay legal fees when all other aspects of a sentence have been completed is "not germane to one's ability to participate intelligently in the electoral process" and is therefore not an appropriate consideration in determining whether an individual is legally qualified to vote. *Id.* Section 13-1 is therefore not a permissible voter qualification but instead is an unconstitutional wealth-based classification.

The majority, however, applies rational basis review and holds that N.C.G.S. § 13-1 does not, in fact, impose an unconstitutional wealth classification because the law bears a reasonable connection to a legitimate government interest. Further, the majority quotes the Eleventh Circuit's decision in *Jones v. Governor of Florida*, 975 F.3d 1016, 1030 (2020), which rejected the idea that a similar disenfranchisement law created a wealth-based classification, reasoning that "[t]he only classification at issue is between felons who have completed all terms of their sentences, including financial terms, and those who have not."

The majority describes *Jones*'s reasoning as "persuasive." But as Plaintiffs point out, the framing of N.C.G.S. § 13-1's only distinction as "between felons who have completed the terms of their sentence, including financial terms, and those who have not," "is exactly the constitutional problem" because the law treats otherwise identically situated individuals differently based on their ability to pay. Further,

> [f]or people on felony probation in North Carolina, the median amounts owed are $573 in court costs, $340 in fees, and $1,400 in restitution. For people on parole or post-release supervision, the median amounts owed are $839 in

court costs, $40 in fees, and $1,500 in restitution. As Plaintiffs explain, these fees are "prohibitive" for many individuals, and therefore conditioning a felon's ability to regain the right to vote on payment "imposes a wealth-based classification that triggers strict scrutiny." For the reasons already explained, N.C.G.S. § 13-1 cannot withstand this exacting review.

It is also necessary to bring attention to the majority's conclusion that it is a legitimate government interest to prohibit felons who have not paid court costs and fines from voting because "the General Assembly could reasonably have believed . . . that felons who pay [such costs] are more likely than other felons to vote responsibly." This recognition is shocking in multiple respects. For one thing, it unintentionally admits what the Plaintiffs have argued all along: that N.C.G.S. § 13-1 is intended to inhibit certain individuals whom the General Assembly perceived as undesirable from voting. This is not a legitimate government interest, even for purposes of rational basis review. While the General Assembly can prescribe a variety of relevant voter qualifications, value judgments about whether certain categories of individuals vote in a way that the General Assembly perceives as morally correct is not one of them. It also recognizes that N.C.G.S. § 13-1 indeed imposes a wealth-based classification by determining that felons who are able to afford their fees "are more likely . . . to vote responsibly." Finally, it makes little sense. As already explained, the ability to pay these expenses "is not germane to one's ability to participate intelligently in the electoral process." *Harper*, 383 U.S. at 668. To be clear, "wealth or

fee paying has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or conditioned. *Id.* at 670.

## B. The Free Elections Clause

The majority also reverses the trial court's final judgment and order based on the trial court's conclusion that N.C.G.S. § 13-1 violates the North Carolina constitution's free elections clause.[14] The trial court explained that "North Carolina's elections do not faithfully ascertain the will of the people when such an enormous number of people living in communities across the State—over 56,000 individuals—are prohibited from voting."

The free elections clause dates back to the 1776 Declaration of Rights, but its roots can be traced back even further to the 1689 English Bill of Rights. *Harper*, 380 N.C. at 373 (citing Bill of Rights 1689, 1 W. & M. Sess. 2, ch. 2 (Eng.)). "The English Bill of Rights arose in the aftermath of King James II's tyrannical abuse of authority to force the mostly Protestant nation to tolerate and recognize the Catholic religion." Bertrall L. Ross II, *Inequality, Anti-Republicanism, and Our Unique Second Amendment*, 135 Harv. L. Rev. F. 491, 496 (2022). The English Bill of Rights, which is the codification of the English Declaration of Rights, " 'was the statutory institution of conditional kingship[s] for the future' through its mandate for an independent

---

[14] Article I, section 10 of the constitution states that "[a]ll elections shall be free." N.C. Const. art. I, § 10. This Court has held that a law violates this provision if it "prevents election outcomes from reflecting the will of the people." *Harper*, 380 N.C. at 376. Today, the majority abandons this established interpretation.

Parliament through free elections." Bertrall L. Ross II, *Challenging the Crown: Legislative Independence and the Origins of the Free Elections Clause*, 73 Ala. L. Rev. 221, 289 (2021) (alteration in original) (quoting Betty Kemp, *King and Commons: 1660–1832*, at 30 (1st ed. 1957)). Among the civil and political right for which it provided, the English Bill of Right declared, "election of members of parliament ought to be free." Bill of Rights 1689, 1 W. & M. Sess. 2, ch. 2.

"North Carolina's free elections clause was enacted following the passage of similar clauses in other states, including Pennsylvania and Virginia." *Harper*, 380 N.C. at 373. As with the states that adopted similar provisions, the purpose of North Carolina's free elections clause was to prevent "the dilution of the right of the people of [the State] to select representatives to govern their affairs, and to codify an explicit provision to establish the protections of the right of the people to fair and equal representation in the governance of their affairs." *Id.* at 373–74 (cleaned up).

The clause's wording has undergone minor changes over time.[15] "[T]hough those in power during the early history of our state may have viewed the free elections

---

[15] As *Harper* explained, the free elections clause originally stated:

> '[E]lections of Members to serve as Representatives in General Assembly ought to be free.' In 1868, in concert with its adoption of the equality principle in section 1, the Reconstruction Convention amended the free elections clause to read '[a]ll elections ought to be free.' In 1971, the present version was adopted, changing 'ought to' to the command 'shall.' This change was intended to 'make it clear' that the free elections clause, along with other 'rights secured to the people by the Declaration of Rights[,] are commands and not mere admonitions to proper conduct on the part of government.'

clause as a mere 'admonition' to adhere to the principle of popular sovereignty through elections, a modern view acknowledges this is a constitutional requirement." *Harper*, 380 N.C. at 376. Today, the directive of the free elections clause is simple: "[a]ll elections shall be free." N.C. Const. art. I, § 10. Interpreting both the text and history of the clause, this Court has explained that "elections are not free" if they "do not serve to effectively ascertain the will of the people." *Harper*, 380 N.C. at 376.

At least 56,516 individuals in North Carolina are denied the franchise under N.C.G.S. § 13-1 because they are on probation, parole, or post-release supervision from a felony conviction in state or federal court. According to the trial court's order, "[i]n 2018 alone, there were 16 different county elections where the margin of victory in the election was less than the number of people denied the franchise due to felony supervision in that county." In fact, the number of people disenfranchised in various counties is up to seven or eight times the vote margin in those counties. "The number of African Americans denied the franchise due to being on felony supervision [also] exceeds the vote margin in some elections," including races for one county's board of commissioners, a sheriff's race, and a board of education race. "In addition to county-level elections, there are statewide races where the vote margin in the election was less than the number of people denied the franchise due to being on community supervision statewide." The 2016 Governor's race, for instance, was decided by far

---

380 N.C. at 375–76 (alterations in original) (quoting *N.C. State Bar v. DuMont*, 304 N.C. 627, 639 (1982)).

fewer votes than the over 56,000 people who are denied the franchise because of felony supervision.

It is challenging to see how North Carolina elections can reflect "the will of the people" when, as the trial court found, "the vote margin in both statewide and local elections is regularly less than the number of people disenfranchised in the relevant geographic area." Moreover, N.C.G.S. § 13-1 places a disproportionately heavy burden on African Americans, thereby suppressing the will of an entire voting demographic. There is little meaning to the words "[a]ll elections shall be free" when election outcomes can be manipulated by barring individuals on felony supervision from voting—individuals who live in our communities, share our concerns about the rules and regulations that govern us, and have the same stake in electing representatives who will represent their interests. These words mean even less when interpreted to permit the continued enforcement of a law that dilutes the efficacy of African Americans' political power. It is inherently inconsistent with the state constitution's command that "[a]ll elections shall be free."

The provision of N.C.G.S. § 13-1 that Plaintiffs challenge is nothing more than an electoral muzzle designed to silence a class of people the legislature deemed unworthy of exercising the fundamental right to vote. But, as has been explained, N.C.G.S. § 13-1 is not defined solely by its sinister intent; in disproportionately disenfranchising African Americans, it has achieved its intended effect. When a statute burdens the fundamental right to vote, "it is the *effect* of the act, and not the

*intention of the Legislature*, which renders it void." *People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 226 (1875). Thus, because N.C.G.S. § 13-1 violates the constitutional mandate of free elections, a requirement that is fundamental to the democratic governance of this state, strict scrutiny is the appropriate level of review. As explained, the law fails under such scrutiny.

In reversing the trial court's final judgment and order, the majority reasons that this reading of the free elections clause is too broad. In so holding, the majority relies on the illegitimate and erroneous interpretation of the free elections clause that it adopts today in a separate case, *Harper v. Hall*, No. 342PA19-3 (N.C. Apr. 28, 2023). This Court's stymied interpretation of the free elections clause as rewritten here fails for the same reasons it does in that case. *See Harper v. Hall*, No. 342PA19-3 (N.C. Apr. 28, 2023) (Earls, J., dissenting). Most importantly, this baselessly narrow interpretation fails to recognize that elections can be manipulated in a number of ways. It is not the manner of manipulation but the result that matters. As the majority recognizes, one way that the free elections clause is violated is if "a law prevents a voter from voting according to one's judgment." Another similarly obvious way to tamper with election outcomes is to bar a particular class of voters from exercising their right to vote because they are deemed less desirable than other members of society. As described throughout this dissent, this is precisely what N.C.G.S. § 13-1 was designed to do. An election conducted under such circumstances

is no freer than an election in which voters are prevented "from voting according to [their] judgment."

## C. The Ban on Property Qualifications

Finally, the majority reverses the trial court's determination that N.C.G.S. § 13-1 violates article I, section 11 of the North Carolina constitution, which provides that "[a]s political rights and privileges are not dependent upon or modified by property, no property qualification shall affect the right to vote or hold office." N.C. Const. art. I, § 11. The trial court concluded that N.C.G.S. § 13-1 violates this ban on property qualifications because "the ability for a person convicted of a felony to vote is conditioned on whether that person possesses, at minimum, a monetary amount equal to any fees, fines, and debts assessed as a result of that person's felony conviction."

The majority concludes that "[b]ecause felons whose citizenship rights have not been restored have no state constitutional right to vote, requiring them to fulfill the financial terms of their sentences as a condition of re-enfranchisement cannot be said to violate the Property Qualifications Clause." In the majority's view, the property qualifications clause refers only to real property, and "[i]nsisting that felons *pay* their court costs, fines, and restitution is not the same thing as mandating that they *own* real or personal property in particular amounts."

"Money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). In fact, it is the specific form of property by which almost all other

possessions, including real property, are acquired. By conditioning rights restoration upon the ability to pay a financial penalty, N.C.G.S. § 13-1 hinges the individual's ability to vote on his or her wealth. This result violates the plain text of the property qualifications clause, which directs that "political rights and privileges are not dependent upon or modified by property[,]"and "no property qualification shall affect the right to vote." N.C. Const. art. I, § 11.

The terms of this clause are expansive. It speaks simply in terms of property qualifications that *affect* the right to vote, regardless of whether that is through a direct property qualification on someone who already possesses the right or an indirect qualification on someone who must be restored of the right. Under these broad terms, when the only barrier to exercising the political right to vote is an individual's lack of wealth, the right to vote is has been affected, and a constitutional violation has occurred.

Similarly, the clause instructs that political rights and privileges are not dependent on property. In so stating, the clause declares that property is not a valid voter qualification, meaning it is not a valid qualification for *any* potential voter, regardless of whether a person already possesses the right or must have the right restored. In other words, the property qualifications clause creates a broad prohibition on a type of voter qualification, and no individual can be barred from voting on that basis alone. As the trial court correctly explained, "when legislation is enacted that restores the right to vote, thereby establishing qualifications which

certain persons must meet to exercise their right to vote, such legislation must not do so in a way that makes the ability to vote dependent on a property qualification." But this is exactly what N.C.G.S. § 13-1 does.

Indeed, the Defendants themselves appear to recognize that the state constitution's disenfranchisement provision does not give N.C.G.S. § 13-1 license to impose a requirement to rights restoration that violates the property qualifications clause. Defendants explain that "nothing in Section 13-1 requires a felon to possess any property." If N.C.G.S. § 13-1 must otherwise comply with the property qualifications clause, then the disagreement can be reduced to the opposing interpretations of the term "property"—a disagreement that is easily resolved by the plain text of the state constitution.

Finally, as has been explained, constitutional provisions "cannot be applied in isolation or in a manner that fails to comport with other requirements of the State Constitution[,]" *Stephenson*, 355 N.C. at 376, meaning that article VI, section 2's denial of the franchise to anyone "adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state" cannot be read in such a way that would violate other provisions of the North Carolina constitution, including the property qualifications clause. Because the clause does not permit rights restoration to be conditioned upon wealth, article VI, section 2 cannot be construed to deny the franchise to individuals who have completed all other aspects

of their sentences but have not paid their court costs, fines, or other related fees. The majority errs in holding otherwise.

The trial court got it right based on the evidence in the record, the extensive findings of fact, and the proper application of the *Arlington Heights* factors, as well as other controlling legal principles of constitutional interpretation. Having found that N.C.G.S. § 13-1 is discriminatory, the trial court clearly had the obligation to fashion a remedy that protects the fundamental state constitutional rights that are at issue here. This Court should affirm the final judgment and order of the trial court. Therefore, I dissent.

Justice MORGAN joins in this dissenting opinion.